JAMES BROWN and PHYLLIS BROWN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. CARL HAAB and JOAN HAAB, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Brown v. Commissioner
Docket Nos. 1859-74 1861-74.
United States Tax Court
T.C. Memo 1977-15; 1977 Tax Ct. Memo LEXIS 428; 36 T.C.M. (CCH) 77; T.C.M. (RIA) 770015; January 24, 1977, Filed *428 Held: On the facts, petitioners' horse breeding activities, carried on through their Subchapter S corporation, were conducted with a bona fide intent to make a profit. John L. Carey, for the petitioners. Mark E. O'Leary, for the respondent. BRUCE MEMORANDUM FINDINGS OF FACT AND OPINION BRUCE, Judge: Respondent determined deficiencies in Federal income taxes in these consolidated cases as follows: Docket No.
Year
Deficiency
1859-74 [1] *429 1969
$2,870.62
1970
3,288.24
1861-74 [2]
1966
$1,417.27
1970
1,922.90
An analysis of the horses bred for sale and sold by Timber Trails from the inception of the corporation until October 31, 1972, is as follows: Year Ending
Number Sold
Total Sales Price
10.31.71
7
$1,105.00
10.31.72
7
3,070.00
An analysis of the breeding horses which were sold by Timber Trails from the inception of the corporation until October 31, 1972, is as follows: Year Ending
Number Sold
Total Sales Price
10.31.71
4
$ 535.00
10.31.72
3
1,260.00
The type of horse in which petitioners were interested and which Timber Trails undertook to breed and raise was a "working type" quarter horse. In 1967 weanlings of this type horse were selling for between $500 and $600. It was the petitioners' plan that Timber Trails would initially acquire a breeding herd of from 12 to 15 mares, from which they expected 12 or 13 foals each year. From these foals the corporation would retain one or two fillies each year and sell the remainder. Because the gestation period was 11 months and the foals required 5 or 6 months to *430 wean, petitioners expected no profit within the first two years of their operation. Petitioners intended to increase the size of the breeding herd if their projection of profits from the enterprise reached fruition. With hay to be grown on the farm, and with petitioners performing most of the necessary labor, the annual cost of maintaining each horse was estimated to be between $125 and $150. At this scale petitioners expected gross receipts to exceed breeding costs by $3,000 to $4,000 a year. Timber Trails' operations were plagued with problems from the outset. Perhaps foremost in leading to its short-lived entry into the horse-breeding business was the change in market demand for the small, stocky "working type" quarter horse to the taller, leggier "racing type" quarter horse. This change in market demand from the type horse which Timber Trails bred was reflected in the prices which they brought when marketed in 1971 and 1972. In addition to the marketing problems which confronted Timber Trails, two of the mares which it owned were infertile and another couple of colts were lost. Also, an epidemic of strangles [2]/ went through the herd for four or five months, requiring *431 unanticipated veterinary care. During 1971, the year Timber Trails marketed its first horses, petitioners foresaw the lack of profitability in continuing their present breeding operations. As a result they decided to disband that activity and utilize the corporate facilities for boarding outside horses. At the time of trial herein Timber Trails no longer owned any horses. The gross receipts and taxable income reported on the returns of Timber Trails from the time of its inception until October 31, 1974, are as follows: Taxable Income Year Ending
Reported
Gross Receipts
10.31.67
[ 754.00) $ 0
10.31.68
(15,209.00)
0
10.31.69
(15,039.00)
150.00
10.31.70
(21,097.00)
211.00
10.31.71
4,073.00
12,407.00
10.31.72
(20,636.00)
4,649.00
10.31.73
2,969.00
10.31.74
939.00 The profit shown for the fiscal year ending October 31, 1971, is misleading, however, and was produced by two related actions. Petitioners were advised by their accountants that the Internal Revenue *432 Service would require that the corporation be paid for the services rendered to the shareholders' personal animals and also that it would be in their own best interest to soon show a profit for the corporation. Consequently, at a special meeting of the board of directors of Timber Trails held on January 2, 1971, each family was assessed a charge of $5,000 for the care of their personal horses and their personal use of corporate vehicles from the time of the corporation's inception. In addition some expenses which would have been properly reportable that year were shifted to the next fiscal year. As to its overall activities in the first five complete years of operation, Timber Trails averaged $16,586 in expenses per year. A partial breakdown of these average expenses annually include depreciation of $4,765.40, interest of $3,011, feed of $1,269.80, insurance of $1,178.20, veterinary care of $717.40, shoeing and trimming of $581, fertilizer of $446.20, and breeding fees for three years of $1,127.33. Only $17 was spent directly on advertising by Timber Trails, although petitioners promoted its horses by word of mouth and some advertising costs were included in auction fees. In *433 addition to their time, petitiones have invested almost $130,000 in capital and loans to Timber Trails. Respondent disallowed expenses of $12,899 and $14,567 claimed by Timber Trails for its fiscal years ending in 1969 and 1970, respectively, those amounts constituting all expenses of the corporation other than interest and taxes. Respondent's action reduced each family's undistributed loss from Timber Trails from $7,520 and $10,548 to $1,070 and $3,265 for 1969 and 1970, respectively. Respondent also disallowed an investment credit of $7.98 and $8.00 claimed in 1969 by petitioners Brown and petitioners Haab, respectively. OPINION From 1968 through 1972, petitioners conducted a horse breeding operation through their wholly-owned Subchapter S corporation, Timber Trails, Inc. Despite a reported profit for fiscal year 1971, the corporation sustained losses annually throughout the entire period. For the years before us, 1969 and 1970, respondent disallowed many of the expenses incurred by the corporation and correspondingly disallowed much of the losses and an investment credit claimed by petitioners on their individual returns. If Timber Trails' horse breeding actvities constituted *434 a trade or business, then petitioners are entitled to deduct the items at issue. Whether Timber Trails was operated with the intention of making a profit is the question that we must decide. Francis X. Benz,63 T.C. 375, 382 (1974); Margit Sigray Bessenyey,45 T.C. 261, 273 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967), certiorari denied 389 U.S. 931 (1967). Intention is a question of fact to be determined in light of all the facts and circumstances revealed upon the record, including the taxpayers' testimony. Patterson v. United States,459 F. 2d 487, 493 (Ct. Cl. 1972). The test to be applied is not one of reasonableness but rather good faith intention or expectation of realizing a profit. Francis X. Benz,supra, at 383. [3]/ Both parties have emphasized the facts and circumstances *435 which they argue conclusively prove the opposite results that they urge upon us. Respondent questions the sincerity of petitioners' intent based on the plan which petitioner Carl Haab testified they envisioned for Timber Trails. Respondent points to the actual expenses incurred, an average of $16,586 in the first five years, and the recurring nature of many of those expenses, combined with an acknowledge built-in loss for the first two years, as opposed to projected receipts of $3,000 to $4,000 in excess of breeding and raising costs of 10 to 12 foals each year as proof that no profit was intended. With the advantage of hindsight, we can see the costly error made by petitioners' decision to engage in their horse breeding actvities. However, a mere objective comprison of figures is misleading. We must view this evidence in conjunction with the additional evidence that petitioners contributed considerable time and money to the enterprise, that this was their first experience with the breeding of horses, and that after they realized that they would be unable to profit from their actvity it was disbanded. Petitioners' entrance into their horse breeding activities stemmed from two *436 basic factors: (1) their personal interest in registered quarter horses, and (2) in searching for a small farm to purchase where they could board their personal horses, petitioners discovered a larger farm with investment value and sufficient acreage on which to raise additional horses. It might be concluded that petitioners' personal interest in horses clouded their business judgment. However, the quality of their judgment is not the question before us. Patterson v. United States,supra, at 494. We are unable to reconcile the scale of Timber Trails' horse operation with lack of an intent to make a profit therefrom. Both Brown and Haab devoted considerable time and Labor to the construction of the corporate facilities and to the care and maintenance of the corporation's animals, the latter of which exceeded 25 in number before the horse breeding activities were abandoned. We do not think that the horse breeding endeavor can be equated with an extension of the pleasure petitioners received from their personal trail riding. We have listened to the testimony of petitioner Carl Haab and observed his demeanor. Despite the adverse inference which could be *437 drawn from his testimony that due to the advice of their accountants that it would be advisable to soon show a profit certain measures were taken to do just that, his forth-rightness in revealing the evidence lends credibility to his statements of the petitioners' intent. Upon consideration of the entire record, we are convinced that the factors which corroborate petitioners' self-professed profit motive predominate. In order to reflect the concession by petitioners Brown, Decision will be entered under Rule 155 in docket No. 1859-74. Decision will be entered for the petitioners in docket No. 1861-74. Footnotes
1. Petitioners James and Phyllis Brown / Strangles is an infectious febrile disease of horses, marked by congestion of mucous membranes and a tendency to form abscesses in various parts of the body.
[2] Petitioners Carl and Joan Haab These cases were consolidated for trial, briefing, and opinion pursuant to a joint motion of the parties on May 5, 1975. Due to a concession by petitioners Brown, the only question remaining for our determination is whether the horse breeding activities of Timber Trails, Inc., a Subchapter S corporation owned equally by all the petitioners, constituted a trade or business within the meaning of the relevant sections of the Internal Revenue Code of 1954. FINDINGS OF FACT. Some of the facts have been stipulated and they are so found. Petitioners James and Phyllis Brown are husband and wife residing in Bremen, Indiana. They filed joint Federal income tax returns for the calendar years 1969 and 1970 with the Internal Revenue Service Center at Covington, Ky. Petitioners Carl and Joan Haab are also husband and wife residing in Bremen, Indiana, and they, too, filed joint Federal income tax returns for 1966, 1969, and 1970 with the Internal Revenue Service Center at Covington, Ky. Hereinafter use of the singular person will refer to petitioner James Brown and petitioner Carl Haab. James Brown and Carl Haab became acquainted in the early 1960's, when both boarded horses at the same farm in Bremen, Indiana. Both men were trail riders and they usually transported their horses from Bremen to a state or national park in Southern Michigan or Southern Indiana, where they would ride the park trails. Among horsemen there is a substantial difference between a trail rider and a horse showman. None of the petitioners were involved with the showing of horses, although both families included several children who were involved with horse shows through their 4-H activities. In the mid-1960's Brown and Haab became dissatisfied with the boarding facilities at their present location, and they began to tour the area around Bremen for a parcel of 15 to 20 acres of land on which to board their personal horses. At that time the Browns owned two or three horses and the Haabs owned four or five horses. Although unable to find a suitable tract of 15 to 20 acres, during their search petitioners located an unimproved farm of about 60 acres situated adjacent to the Bremen city limits. The farm consisted of 20 acres of timberland and 40 acres of tillable soil, and it was located approximately one mile from each petitioner's home. Despite the fact that the acreage was in excess of that needed for boarding their personal horses, the petitioners considered that the farm's close proximity to the city limits of Bremen made it ideal as a site for a future real estate subdivision. Petitioners also considered that they would be able to sell some of the standing timber. In addition to the benefits expected from the land's appreciation in value and from the sale of timber, petitioners decided that the farm would be large enough to breed and raise registered quarter horses - the type of horses which they owned and in which they were interested. Inasmuch as neither Brown nor Haab had theretofore been involved with horse breeding, prior to embarking upon their venture with additional horses, petitioners discussed the subject with several other horsemen and horse breeders in the local area, including Larry Powell, who was National Director of the American Quarter Horse Association at the time of trial. Petitioners also retained attorney James Neu for professional advice as to the form and manner of operations. Having decided to do business in corporate form, upon Neu's recommendation, a firm of certified public accountants, Umbaugh & McQueen, was retained to advise further in the business venture. On March 30, 1967, Timber Trails, Inc., was incorporated under the laws of the State of Indiana. Timber Trails was on the accrual method of accounting for Federal income tax purposes and it reported income for each fiscal year ending on October 31. During the taxable years in issue, each of the petitioners owned a one-fourth interest in Timber Trails. Each of the shareholders is also an officer of the corporation. On November 30, 1967, the shareholders elected to have Timber Trails treated as a Subchapter S Corporation under sections 1371 and 1378 of the Internal Revenue Code of 1954. The Articles of Incorporation of Timber Trails state, in part, that the corporation may "Buy, sell, breed, rent and board horses and other animals. Train horses and other animals and give riding instructions and in general to carry on the business of operating a stable and all matters incidental thereto, including the power to buy, sell and deal generally in horse food, supplies and equipment of all and every kind of description." Timber Trails is a member of both the American and the Indiana Quarter Horse Associations.
In April, 1967, petitioners made a down payment to purchase the 60-acre farm, and the contract of purchase was subsequently ratified and taken over by the corporation. During the taxable years in issue, the activities of Timber Trails were primarily conducted by the petitioners. The corporation had no other employees, although a part-time trainer was hired at one time and additional casual labor was employed from time to time. During 1969 and 1970, James Brown was employed as a vice-president of the Bremen-Gray Iron Foundry, Inc., and he devoted about 20 to 25 hours per week to the activities of Timber Trails. Carl Haab retired from his employment at Wyatt Grain Co. in 1966, although he remained as an officer and director of that corporation, and during 1969 and 1970 he worked about 20 hours per week at Bornemann Fabrics, Inc., another business in which he held an ownership interest. Also during those years Carl Haab devoted 40 to 50 hours per week to the activities of Timber Trails. One of the first activities undertaken by petitioners after purchase of the farm was to construct a horse barn. A local contractor was hired to build the outer structure, and Brown and Haab completed the inside with 25 box stalls. Timber located on the farm which was cut by Brown and Haab and hauled by them to a local sawmill was used to complete the interior work on the barn and to build fences and gates. The corporate facilities also include an open horse training area, a tack room, and a storage area. Brown and Haab also fed the horses, cleaned the barn, and planted, mowed and baled hay once their horse operation began. Brown and Haab's trail horses were moved from their former boarding place to the pasture on the farm shortly after its acquisition, but their children's horses were not moved until after completion of the barn some time in 1968. It was in November of 1967 that Timber Trails first acquired horses of its own. Haab initially contributed 4 brood mares to the corporation and Brown contributed 3 such animals, including one that was in foal. The breeding herd of Timber Trails held during and on hand at the end of each fiscal year was as follows: / In addition to the brood mares represented on this chart, Timber Trails acquired a stallion in 1969.
[1] / ↩
Total Breeding
Breeding Horses on
Horses Held Year Ending
Hand at end of Year
During Year
10.31.67
0
0
10.31.68
7
7
10.31.69
14
14
10.31.70
16
16
10.31.71
12
18
10.31.72
7
12
3. / Although petitioners' brief was devoted largely to analysis of the facts in relation to the regulations promulgated under section 183, Internal Revenue Code of 1954↩, both parties recognize the inapplicability of that section to the years currently before us.