Charles B. Pennington and Dorothy S. Pennington v. Commissioner.
Pennington v. Commissioner
Docket No. 4980-65.
United States Tax Court
T.C. Memo 1967-111; 1967 Tax Ct. Memo LEXIS 149; 26 T.C.M. (CCH) 520; T.C.M. (RIA) 67111; May 18, 1967
Donald D. Eleming, for the petitioners. Lee A. Kamp, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the years 1961, 1962, and 1963 in the amounts of $792.39, $844.38, and $1,620.14, respectively. The sole issue for determination is whether amounts expended by petitioners in the operation of the Pony Tail Ranch are deductible as expenses incurred in a trade or business within the purview of section 162 of the Internal Revenue Code of 1954. [1]
Findings *150 of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Charles B. Pennington (hereinafter sometimes referred to as Charles) and Dorothy S. Pennington (hereinafter sometimes referred to as Dorothy), husband and wife, filed joint Federal income tax returns for the calendar years 1961, 1962, and 1963 with the district director of internal revenue, Seattle, Washington. Charles and Dorothy maintain their legal residence at Seattle, Washington. Residing with them at their Seattle residence are their four daughters: Ann, age 21; Robin, age 19; Carol, age 16; and Gaylen, age 14. Charles is the owner of a small business corporation engaged in providing a merchant patrol service called "Surrey Patrol System, Inc." Both he and Dorothy devote part of their time to the operation of this business and both receive a salary from the corporation. During the years 1961, 1962, and 1963 petitioners had in their employ one Donald Whitecraft on whom they relied for the management of the corporation. Whitecraft was in the corporation's employ from approximately 1957 until his death in 1964. *151 Since Whitecraft's death petitioners have had to devote substantially more time to the operation of the corporation. In 1956 Charles and Dorothy purchased a 25-acre tract of land in Westport, Washington, approximately 110 miles from Seattle, with the intention of using it as a breeding farm for horses. This area was particularly suitable for their purposes as there are many horses and horsemen in the area and it is a center of tourist activity. The property was improved by them and presently consists of a two-bedroom house; a hay and grain storage and feeding barn having a capacity for approximately 10 horses; and adjoining stud pen; a brood-mare foaling field; and 5 other fenced-in fields. This improved area comprised approximately 5 of the original 25 acres. This acreage and the improvements thereon are known as the "Pony Tail Ranch." [2]
Petitioners purchased the ranch and made improvements thereon for the purpose of using it as a place for the breeding of Appaloosa horses. *152 [3] Petitioners spend an average of 30 to 40 days a year at the ranch. These visits were always in connection with their breeding business. The ranch has never been used by them as a residence, as an entertainment facility, or as a farm for the growing of crops. At the time the ranch was purchased neither Charles nor Dorothy nor any of their daughters had any background in the area of horses or horsemanship. Since the acquisition, however, petitioners have attempted to informally educate themselves about the breeding of Appaloosa horses. They attended sessions of the Appaloosa Conventions which dealt with all phases of horse breeding as a business enterprise, including a forum on taxation. They have also attempted, through books and periodicals and personal contact with other horse breeders, to acquire some degree of expertise in the subject of breeding horses. In addition, petitioners have secured membership in the following organizations Club, Palouse Emyien Appaloosa Club, Western Washington Regional Appaloosa Club, and the Washington State Hunters and Jumpers. Commencing on January 1, 1961, Dorothy *153 established a set of business records on which she kept an account of all income and expenses. These records were separate from petitioners' personal expenditures for all years from 1961 to date. [4] A separate checking account was used for income and expenditures. The keeping of these records was supervised by an accountant employed by petitioners though the actual records were kept by Dorothy. Office space was set aside for the conduct of the breeding business in the suite of offices maintained by Surrey Patrol Systems, Inc. Petitioners' planned method of operation was to engage in the breeding of their own horses - to cull and eventually sell those horses which did not meet their particular standards. [5] With reference to horses of superior quality, they trained and entered them in horse shows for the purpose of advertising their ranch, and in the case of a stallion to have it acquire a reputation so that it could be used to stand stud for outside mares for a fee, as well as to be bred to petitioners' mares. In addition, petitioners *154 advertised generally in trade journals and magazines regarding the stud services of their stallion. In their actual operation petitioners, during 1961 and 1962, entered a mare, Simcoes Kissammee, and in 1962 and 1963 entered their stallion, Chief War Point, in various horse shows. Both horses were highly successful, and the stallion was the Champion Washington State Performance Horse for 1963. After each horse had acquired a valuable reputation, petitioners ceased to enter it in shows and attempted to breed it. Petitioners and their daughters were not sufficiently skilled at either the breeding or showing of horses to do more than preliminary work in reference to the latter. They therefore hired an independent trainer (Dee Parham) and would arrange for various stables to ride the horses at the various shows. [6] Because the breeding process required skilled people and equipment, neither of which are available at the Pony Tail Ranch, petitioners' stallion when standing *155 stud is boarded at various farms or stables. Another reason for the boarding of the stallion is to enable petitioners to take advantage of facilities more centrally located than their own ranch. In 1959 petitioners began to acquire horses, and by 1961 they had purchased six horses: four mares, one gelding, and one stallion. [7] In 1962 they purchased their prize stallion, Chief War Point. Their attempts to breed their mares have not been overly successful. Some attempts did not result in conception and of those that did only two produced foals which survived. Of these two, both colts, one was sold in 1964 and the other, having been gelded for lack of Appaloosa conformation, was sold in 1965. In regard to petitioners' four mares - in 1964 one was accidentally killed, and two have been sold (one in 1963 because she was unable to conceive due to disease, and the second in 1964 because of a loss of coloring and an R/H factor in the blood). Also, petitioners' original stallion, after having sired one foal, was gelded and is currently being offered in trade for a *156 mare. At present petitioners' stable has been reduced to four horses: a mare, a stallion, and two geldings. Neither have petitioners' efforts to stand their stallion, Chief War Point, for stud services been successful. He has earned merely four fees since being offered for stud in 1963. During 1964 petitioners had trouble finding a place at which to "stand" the stallion. One stable decided to suspend its breeding activity, and a second breeder was found to be unacceptable by petitioners after they had stood the stallion at a farm for an undisclosed period ending in 1965. Throughout this entire period, however, petitioners continued to advertise the stallion's services and have reduced the fee requested from $200 to $100 in an effort to secure business. Though they have not purchased replacement mares for the ones that were sold, petitioners are presently involved in negotiations for a mare in foal in exchange for one of their geldings. On their joint Federal income tax returns for the taxable years 1961, 1962, and 1963, petitioners *157 reported a net loss from their horse-breeding business of $3,194.70, $4,244.55, and $5,510.86, respectively. In his statutory notice of deficiency respondent disallowed these losses claimed by petitioners. Ultimate Finding of Fact During the taxable years in issue petitioners were engaged in the business of horse breeding with the intention of making a profit and not as a hobby. Opinion The sole issue for decision is whether petitioners may deduct the expenditures incurred in the operation of the Pony Tail Ranch for the taxable years involved as expenses incurred in a trade or business under section 162. [8] Respondent contends that petitioners operated the ranch as a hobby and without an intention to make a profit. We are of the opinion, and have found as a fact, that petitioners operated the ranch with the intention of making a profit. We therefore hold for petitioners. Whether petitioners operated the ranch as a hobby or as a business with the intention *158 of making a profit is a question of fact to be determined from the record in each particular case. Morton v. Commissioner, 174 F. 2d 302 (C.A. 2, 1949), affirming a Memorandum Opinion of this Court, certiorari denied 338 U.S. 828 (1949). Though petitioners must demonstrate that they had a bona fide intention to make a profit, they need not show that this intention was reasonable. Margit Sigray Bessenyey, 45 T.C. 261 (1965), on appeal (C.A. 2, June 10, 1966). Nor is the fact that to date they have experienced only losses inconsistent with such an intent though it is a factor to be considered. Morton v. Commissioner, supra. When they embarked upon this enterprise, petitioners attempted to educate themselves on the subject of breeding horses, including the business potential of such activity. They have sought contact with other breeders and have secured membership in a number of organizations interested in the Appaloosa breed. For the years in issue they have kept regular business records and segregated them from their personal records. They have advertised the stud services of their stallion extensively, and in the hope of securing *159 business have reduced the requested fee by fifty percent. Respondent places great weight on the fact that petitioners entered some of their horses in various horse shows and have expended a relatively large sum of money in costumes for these shows. He infers therefrom that petitioners are in reality showing these horses as a hobby. We cannot agree. The entire record reveals that these shows are an important part of petitioners' over-all business operation. This activity is in the nature of advertising, first in relation to the particular horse involved and second in relation to their trade name, "Pony Tail Ranch." Respondent also points to the fact that petitioners only spend approximately 30 to 40 days annually at the ranch. We do not view this factor as controlling on the facts before us. The record shows that due to inexperience and lack of physical ability on the part of petitioners, as well as a lack of experienced personnel and facilities at the ranch, they rely greatly on independent trainers and breeders in the conduct of their business. Though in the actual physical operation petitioners do little more than aid in the preliminary training of their horses, Dorothy in particular *160 impressed us with her knowledge of the operation from a business standpoint. She appears to have been the main force in the actual operation, both in record keeping and in analyzing the costs and potential of their method of operation. Under these circumstances, we do not consider the amount of time spent by petitioners at the ranch as being inconsistent with a bona fide intention to operate the ranch with an eye to making a profit. Respondent also points to various particulars in petitioners' method of operation urging us to draw an inference that these methods are not consistent with a profit motive. Among these are the following facts: that petitioners have only once borrowed funds to purchase horses; that they have entered horse shows rather than diverting monies so expended to the purchase of additional stock; that they have allowed their daughters on some occasions to ride one of their horses in a show; and that some of their horses are of unknown ancestry. Though these factors are all relevant and even assuming that petitioners' method of operation may not be that of the most sophisticated business operation, we cannot find, on this record, that petitioners were engaged in *161 operating without an intent to make a profit. Petitioners are engaged in a business in which profit can only be reasonably anticipated after an operating period of eight to ten years. They have not experienced much success to date in their attempts at breeding their horses and have, due to various circumstances, been forced to deplete their stock. Though they have not made a profit, we are satisfied that they began and have operated the ranch with a bona fide intention to do so. The expenditures thus incurred are therefore deductible. Decision will be entered under Rule 50. Footnotes
1. Additional adjustments made by respondent in the notice of deficiency have been agreed to by the parties. Petitioners request refunds for the years 1961, 1962, and 1963 in the amounts of $166.02, $415.46, and $6.89, respectively.↩
2. The name "Pony Tail Ranch" was the trade name used by petitioners as the name for their ranch and horse breeding enterprise and as a prefix for the name of each of the horses which they registered.↩
3. The Appaloosa is a breed of horses primarily known for their distinctive coloring.↩
4. Petitioners did not keep segregated records prior to 1961 and in the years prior to 1961 no business expense deductions were claimed by them.↩
5. The record reveals that horse breeding on the scale attempted by petitioners is a relatively long-range business opportunity, generally requiring some 8 to 10 years of operation before a profit might be expected.↩
6. Though petitioners' daughters have ridden horses at shows, due to their lack of training this activity was minimal.↩
7. The stallion was originally purchased by petitioners for their trainer but was kept by them when he was unable to pay them the purchase price.↩
8. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.↩