Estate of Lillian Solomon, Deceased, George D. Solomon, Jr., Executor and George D. Solomon, Jr., Surviving Spouse v. Commissioner.
Estate of Solomon v. Commissioner
Docket No. 2489-66.
United States Tax Court
T.C. Memo 1967-186; 1967 Tax Ct. Memo LEXIS 73; 26 T.C.M. (CCH) 919; T.C.M. (RIA) 67186; September 26, 1967
Howard W. Domeck and David H. Wilson, for the petitioners. Larry L. Nameroff, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in petitioners' income tax for the years 1961, 1962 and 1963 in the respective amounts of $2,203.48, $2,285.67 and $2,169.54. The only issue is whether petitioners are entitled to deduct losses incurred by them during those years in the breeding of Arabian horses. Findings of Fact Some of the facts were stipulated and they are so found. George D. Solomon, Jr. *74 and Lillian Solomon were husband and wife and were residents of Cuyahoga Falls, Ohio, during the years 1961, 1962 and 1963. They filed joint income tax returns for these three years with the district director of internal revenue, Cleveland, Ohio. Lillian Solomon died on May 28, 1964 and George D. Solomon, Jr. was appointed executor of her estate. On the date the petition in this case was filed George was still a resident of Cuyahoga Falls, Ohio. George D. Solomon, Jr., hereinafter called petitioner, is a doctor specializing in obstetrics and gynecology since 1955. His office is in Cuyahoga Falls. In 1958 petitioner purchased seven and one-half acres of unimproved land at what is known as 485 Lourdes Drive, Cuyahoga Falls, Ohio. Actually, the property is about two miles outside the city limits of Cuyahoga Falls. In 1959 petitioner built a house on the property and in 1960 he built a barn which was approximately 30 feet wide and 40 feet long and contained seven stalls. The house and surrounding yard occupied about one acre of the property. Petitioner and his family moved into the house in January 1960. In 1961 petitioner and his wife had seven children, the oldest of whom was 10 years *75 old. Petitioner's uncle, who is also a physician, owns 289 acres of land in Pennsylvania where he breeds Arabian horses. Petitioner visited the Pennsylvania farm from time to time during the years between 1955 and 1960 and he became acquainted with the problems of breeding and maintaining Arabian horses. In 1960 petitioner purchased a pony which he sold in the following year for $75, realizing a loss. Also in 1960, petitioner purchased a two year old registered Arabian mare for $2,000 and a one year old registered Arabian mare for $1,000. In 1962 petitioner purchased a one year old registered Arabian stallion for $1,000 and a two year old quarter-pony mare for $300. In 1963 petitioner purchased a four year old registered Arabian stallion for $2,600. Except for the pony purchased by him in 1960, petitioner purchased all of the above horses from his uncle. In 1963, at about the time petitioner purchased the four year old stallion from his uncle, the petitioner sold back to his uncle for $1,000 the stallion petitioner had purchased for that same amount from his uncle in 1962. At the end of 1963 petitioner owned a total of six horses, including two foals from purchased mares. Petitioner *76 purchased a three year old mare in 1964 for $4,000 and during 1965 and 1966 he sold four horses for a total amount of $6,730. At the end of 1966 petitioner owned a total of 12 horses. Petitioner kept a detailed record of his various expenditures in connection with the maintenance of the horses. In October 1961 he attended a three-day conference on horse management held in Moline, Illinois. Petitioner attended horse shows, subscribed to journals dealing with horses, and on occasion consulted with the local Federal farm agent. Petitioner helped with the construction of the barn in 1960, and during the years in question he did most of the work involved in caring for the horses (about 15 hours a week). During the years 1961, 1962 and 1963 only one of the horses was broken for riding. Petitioner showed the following receipts, expenses, depreciation and losses on Schedule F (farm income and expenses) of his income tax returns for 1961, 1962 and 1963 in connection with the breeding of horses: Depreci-
Loss
Year
Receipts
Expenses
ation
Claimed
1961 $75
$2,538.95 *
$1,532.67
$3,996.62
1962
None
2,646.65
1,246.74
3,893.39
1963
None **
2,332.13
1,496.73
3,828.86
*77 Respondent in his statutory notice of deficiency disallowed the deductions claimed by petitioner for the losses incurred by him in the horse breeding operations in 1961, 1962 and 1963 in the respective amounts of $3,996.62, $3,893.39 and $3,828.86 with the explanation that such losses were not allowable under the provisions of section 165 or any other provision of the 1954 Internal Revenue Code. [1]
Opinion The only issue is whether petitioner is entitled to deduct the losses incurred by him in 1961, 1962 and 1963 in breeding and raising Arabian horses. In order to prevail, petitioner must show that his operations were conducted as a trade or business with the intention of making a profit so that his expenditures or losses could be deducted under the relevant *78 sections of the 1954 Code. Sections 162(a) and 165 of the Internal Revenue Code. Whether or not petitioner had the requisite intention or expectation of making a profit is a question of fact which must be determined from all of the evidence. Margit Sigray Bessenyey, 45 T.C. 261, affd. 379 F. 2d 252 (C.A. 2, 1967). We are convinced after a careful review of the record that petitioner did conduct his horse breeding operation as a business with the intention of making a profit. Breeding and raising horses for sale may constitute a trade or business if the profit motive is present. Commissioner v. Widener, 33 F. 2d 833 (C.A. 3, 1929). Petitioner, who was a physician, testified that he began to breed Arabian horses with the intention of eventually creating an additional source of income. He came from a relatively poor background and he testified that, apart from a few shares in a mutual fund, he had no investments or any outside source of income except that from his medical practice. Petitioner had built a new house in 1959 on some 7 1/2 acres of property acquired by him in 1958 and had moved his large family into the *79 house in January 1960. In 1960 he built a barn close to the house and in that same year started to acquire Arabian horses. It would be hard to believe that petitioner, with his early background and at this particular juncture of his life, with mounting expenditures and responsibilities, would embark on a hobby entailing thousands of dollars in costs and much physical labor. We think it would be unlikely that petitioner would have done so without a profit motive. Petitioner's intent to make a profit from his horse breeding operation was demonstrated in several ways. He made every effort to keep expenses down by doing most of the necessary manual work by himself. He helped build the barn and later he cleaned the stalls, fed the horses, put up fencing, and did whatever else was necessary. Activities of this nature could hardly be called recreational. Petitioner also made efforts to conduct his operations along sound business-like lines by attending a horse management conference, attending horse shows, studying journals concerned with Arabian horses, and by consulting the local farm agent. For several years prior to acquiring his first Arabian horses in 1960, petitioner spent much *80 time on his uncle's farm in Pennsylvania where his uncle, also a doctor, was engaged in the business of breeding Arabian horses on a substantial scale. Petitioner testified that he discussed with his uncle all aspects of the breeding of Arabian horses, including the profitmaking potential, and he understood that a profit could be made from such a venture. Petitioner's testimony in this respect is reinforced by the testimony of his aunt who, together with petitioner's uncle, operated the horse breeding farm in Pennsylvania. She testified that their farm of some 300 acres and 25 horses was a profitable business operation, and we have no reason to doubt this testimony in the least. Petitioner kept a meticulous record of all his expenditures, which further indicates that the venture was intended as a business rather than as a hobby. There is no indication here of any unnecessary expenditures. Losses can be expected in the early years of a horse breeding venture. Such early losses are understandable in view of the time evidently needed to establish the reputation of the taxpayer's stallion, brood mares and stables. Here we are concerned with the years 1961 through 1963, and the record *81 shows that petitioner only began to acquire the first Arabian mares in 1960 (a two year old and a yearling) and the first Arabian stallion in 1962. Petitioner testified that mares cannot be bred until they are three years old. Under the circumstances of this case we do not think that petitioner's early losses are inconsistent with his professed intent to make a profit from his horse breeding venture. Even though petitioner did suffer these modest losses in the early years of his venture, his investment in his horses and stables steadily increased in value according to the testimony of both petitioner and his aunt who had ample experience in the raising and selling of Arabian horses over the years. We realize, of course, that profit and loss must be computed for tax purposes on an annual basis, but we believe that the increase in value of petitioner's investment indicates the profit potential present and has some bearing upon petitioner's professed intention to make a profit from his operations. See Israel O. Blake, 38 B.T.A. 1457 (1938). Finally, the record shows that petitioner began to make sales in the years subsequent to 1963. He testified that in 1965 he sold a *82 yearling colt for $1,200 and a weaning filly for $1,200, and that in 1966 he sold a three year old mare for $3,250 and a yearling colt for $1,080. There is no evidence that petitioner or his family used his horses for recreational purposes or that they kept the stable as a social diversion. Petitioner rode three or four times a year to exercise the horses. Petitioner's wife never rode, and his young children rarely rode. There were no bridle paths in the neighborhood. None of petitioner's local friends raised horses and the record shows that the social life of petitioner's family had no connection with his horse raising activity. Moreover, the pictures of the barn introduced in evidence show a simple, utilitarian construction with none of the frills which would indicate an extravagantly maintained show place with no concern as to cost. We are convinced from the entire record that petitioner was engaged in the horse breeding and raising venture as a trade or business with the intention of making a profit and we hold that petitioner was entitled to the deductions claimed by him during the years in question. Petitioner is sustained on this issue. Decision will be entered for the *83 petitioners. Footnotes
*. These expenses include expenditures of $171.91 for a saddle and $149.11 for a saddle, bridle and blankets, as well as an expenditure of $321.75 for a driveway to the barn. ↩
**. Petitioner reported a gain of $90 realized on the sale of the stallion for $1,000 in 1963 on Schedule D of the income tax return.↩
1. All section references will be to the 1954 Internal Revenue Code↩, as amended, unless otherwise noted.