THEODORE N. AND ADELINE M. ENGDAHL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9912–75. Filed July 11, 1979.

---

*Andrew L. Faber,* for the petitioners.
*Woodford G. Rowland,* for the respondent.

HALL, *Judge:* Respondent determined deficiencies in petitioners' income tax as follows:

| Year | Deficiency |
| --- | --- |
| 1971 | $9,471.84 |
| 1972 | 6,309.55 |
| 1973 | 9,193.55 |

The issue for decision is whether petitioners' horse-breeding operation was an "activity * * * not engaged in for profit" within the meaning of section 183(a).[1] Our determination as to this issue will automatically resolve whether petitioners are entitled to investment credits for assets purchased for their horse-breeding operation.

#### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

At the time of filing their petition, petitioners Theodore N. and Adeline M. Engdahl were residents of Santa Clara County, Calif.

Dr. Engdahl has been a practicing orthodontist since 1946. Net income from his practice for 1971, 1972, and 1973 was $88,661.14, $87,296.46, and $81,766, respectively. Petitioners have no substantial income other than Dr. Engdahl's orthodontic practice. At the time of trial, Dr. Engdahl was 62 years old and his wife was 63.

Petitioners have four children—one son and three daughters. Petitioners became involved with saddle-bred horses in 1951 when their oldest daughter started riding lessons.[2] Subsequently, petitioners purchased several saddle horses which were shown by their daughter at various horse shows in California. Petition-

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

[2] By 1967, petitioners' children were grown and no longer lived at home.

ers boarded their horses at a stable and hired a professional trainer to train the horses.

In 1964, petitioners realized that Dr. Engdahl's retirement from his orthodontic practice was imminent, and began considering what business they might enter to supplement Dr. Engdahl's retirement income. Petitioners consulted with their trainer, their two veterinarians, and other people in the horse-breeding business as to the possibility of setting up a horse-breeding operation. The veterinarians were of the opinion that the future looked very promising locally for breeding, raising, and showing American saddle-bred horses. Petitioners concurred in this opinion based upon their observations that many children in the area rode this breed of horse, which was at that time in short supply. Petitioners received advice from these people about stud fees and the general economics of running a horse-breeding operation. In addition, petitioners consulted reference books and materials. They learned that the start-up phase of an American saddle-bred breeding operation was 5 to 10 years.

Petitioners decided in 1964 to establish a horse-breeding operation, and began with four horses. At that time, petitioners did not own facilities for keeping horses on their own property, so they boarded the horses and had them trained off their premises.

In order to make their operation more profitable, petitioners were advised to purchase a ranch on which they could board their horses. After searching for a year, petitioners located suitable property (the ranch) in Morgan Hill, Calif. They purchased the property in 1967, and have conducted their horse-breeding activities there since. Their residence occupies approximately one-fifth of the 2½-acre ranch. The remainder is used for the horse operation. The residence in which petitioners lived prior to moving to the ranch was larger and more attractive than the one at the ranch. Petitioners did not buy the ranch with the expectation of later subdividing it.

Upon purchase of the ranch, petitioners constructed a 7-stall stable (convertible to 12 stalls), a tack room capable of storing 7 to 8 tons of hay, five fenced pastures, and a holding corral. In addition, petitioners planted the pasture and installed an irrigation system for the pasture land. The installation of the irrigation system, much of the fencing, and a two-stall addition to the barn were constructed by petitioners.

From 1964 through 1973, petitioners registered 10 purebred American saddle-bred horses with the American Saddle Bred Registry in Louisville, Ky. During this period, petitioners' brood mares produced 11 live foals and had 4 stillborn foals or miscarriages. By the end of 1973, two of the live offspring had died, three had been sold, and those remaining were in training off the premises or were being held in pasture. In 1973, petitioners had nine horses. Of these, two mares and a stallion were purchased, while five mares and a stallion were foaled by petitioners' brood mares (two of which were sired by stallions owned by others, and four were sired by petitioners' own stallions).

Together, petitioners spend an average of 35 to 55 hours per week caring for the horses and maintaining the improvements on the ranch. On weekdays, Dr. Engdahl rises around 5:30 a.m. to feed the horses and muck out the stalls. In the evenings and on week-ends, he performs normal maintenance. Dr. Engdahl attends meetings as a director of the California Saddle Horse Breeders Association. Each morning, Mrs. Engdahl checks the horses and the fly control units. She then exercises and grooms the horses, cleans their feet, and mucks out the stalls. Breeding, delivering foals, and attending to sick or injured horses require extra work by petitioners. Petitioners employ high school students part-time to help with the heavy work around the barn. Neither petitioner rides horses. Both petitioners view their efforts in connection with the horse operation as jobs which have to be done; neither petitioner has any affection for the horses themselves.

At all times material to this case, petitioners' horses were trained by a professional trainer. The trainer entered petitioners' horses in shows when he felt they were ready and when he had time to show them. During the years in issue, petitioners' horses were exhibited by their trainer at 10 shows and won eight awards. Prizes typically included ribbons, trophies, and prize money ranging from $10 to $150 per event. When petitioners attended a show, they bathed, groomed and prepared the horses. Petitioners occasionally participated in social activities in connection with the horse shows. Apart from these activities, petitioners' social life at home is not structured around either the horse business or people associated with horses.

Horse shows are the best form of advertising for American

saddle-bred horses. In addition to exhibiting at horse shows, petitioners advertised in horse show programs, newspapers, and a horsemen's magazine, and through word of mouth. Petitioners advertised their horses for sale and for breeding.

At all times since 1964, petitioners maintained books and records of their horse operation following procedures suggested by their certified public accountant. Petitioners maintained one checking account from which checks for personal use, Dr. Engdahl's orthodontic practice, and the horse operation were drawn. The allocation of each check to one of the above three purposes was noted on the check stub; expenses were subsequently distributed to accounts on separate ledgers maintained for the orthodontic practice and the horse operation. Income from the horse operation was deposited in a savings account separate from other personal savings accounts maintained by petitioners. Petitioners' accountant reviewed petitioners' record-keeping and summarized the books quarterly. At the end of each year, the accountant prepared a summary recapitulation of the horse operation showing expenses broken down by item for each month. This enabled petitioners to keep track of monthly variations in their expenditures. Dr. Engdahl and the accountant then discussed the summary sheet, reviewing what petitioners spent during the year for training, feed, horse shows, veterinary costs, etc. Petitioners' accountant was of the opinion that this bookkeeping system was appropriate for petitioners' operation.

Petitioners' operating losses from 1964 through 1975 for their horse operation were as follows:

| Year | Gross income | Expenses | Profit or (loss) |
|------|------|------|------|
| 1964 | $160 | $8,820 | ($8,660) |
| 1965 | 770 | 13,776 | (13,006) |
| 1966 | 658 | 10,970 | (10,312) |
| 1967 | 550 | 18,343 | (17,793) |
| 1968 | 115 | [3]23,460 | (23,345) |
| 1969 | 166 | 16,648 | (16,482) |
| 1970 | 10 | 18,620 | (18,610) |
| 1971 | 454 | 17,543 | (17,089) |

[3]Includes $1,954 casualty loss incurred upon accidental death of petitioners' mare, Duchess.

| 1972 | 1,136 | 19,925 | (18,789) |
| 1973 | 490 | 19,016 | (18,526) |
| 1974 | 666 | 19,761 | (19,095) |
| 1975 | 0 | 14,916 | (14,916) |

Petitioners' gain or losses from the sale of horses during the same period were as follows:

| Year | Sales proceeds | Adjusted basis | Gain or (loss) |
|------|----------------|----------------|----------------|
| 1964 | None | --- | --- |
| 1965 | $1,650 | $2,349 | ($699) |
| 1966 | None | --- | --- |
| 1967 | None | --- | --- |
| 1968 | None | --- | --- |
| 1969 | 750 | 0 | 750 |
| 1970 | 500 | 230 | 270 |
| 1971 | 1,500 | 1,458 | 42 |
| 1972 | 3,100 | 1,321 | 1,779 |
| 1973 | None | --- | --- |
| 1974 | None | --- | --- |
| 1975 | 4,750 | 0 | 4,750 |

Petitioners attribute their unprofitability to a combination of adverse factors beyond their control. First, the demand for American saddle breds foreseen by petitioners failed to materialize due to a shift in fashion among horse purchasers in California. There was also a decline in the number of entries for this type of horse in California shows. In the second place, the costs associated with horse operations increased from 1964 to 1973. For example, hay rose from $30 to $75 per ton; grain, from $3.50 to $7.95 per 100 pounds; and veterinarians' fees, from $10 to $15.50 per call plus medicine. Third, petitioners encountered medical problems with some of their horses. For example, during their first year of operation, petitioners sent one brood mare to Missouri to be bred to a champion stud. This breeding produced a young stud named Royal Jubilation. Petitioners expected to use him as a breeding stallion; however, at the age of 4 he developed colic. He failed to respond to medical care and died shortly after surgery. Fourth, the Duchess, petitioners' most expensive mare, bought in 1965 for $6,500, died when hit accidentally by an automobile. Fifth, petitioners' trainer failed to use his best efforts in breeding and showing petitioners' horses. Over the years, petitioners realized that their trainer's indecision about

training several of their horses was hurting the development of these horses. Petitioners also discovered that their trainer placed the showing of petitioners' horses second to the showing of horses of some of his other customers. As a result, petitioners brought all of their horses back to the ranch. Sixth, because petitioners could not afford to invest in the most expensive horses, they attempted to diversify by purchasing horses on speculation for resale. Unfortunately, these horses did not produce the quality of offspring for which petitioners hoped; the horses were subsequently sold.

As of December 31, 1977, the fair market value of the Morgan Hill ranch, including improvements, was approximately $225,000; petitioners' cost was $83,146. In addition, petitioners' remaining four horses had appreciated in value by approximately $18,750. By the time of trial, petitioners had abandoned hopes of making a profit on their horse operation and were winding down their operation preparatory to terminating it. The ranch was for sale.

On their income tax returns, petitioners deducted losses of $17,617.52 in 1971, $17,009.94 in 1972, and $18,526 in 1973 resulting from their horse-breeding operation. Petitioners claimed investment tax credits attributable to their horse operation of $12.13 in 1971, $190.98 in 1972, and $24.13 in 1973. In his notice of deficiency, respondent disallowed these losses and the claimed investment tax credits based on his conclusion that petitioners' horse operation was an activity not engaged in for profit.

## OPINION

The sole issue for decision is whether petitioners' American saddle-bred horse operation was an "activity * * * not engaged in for profit" within the meaning of section 183(a). Section 183(a) provides that if an individual engages in an activity, and if that activity is not engaged in for profit, then no deduction attributable to that activity shall be allowed except as otherwise provided under section 183(b). Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

Breeding and raising horses for sale may constitute a trade or business for purposes of section 162. *Commissioner v. Widener,*

33 F.2d 833 (3d Cir. 1929). Whether it does or not, depends on whether petitioners engaged in the venture with the predominant purpose and intention of making a profit. *Allen v. Commissioner*, 72 T.C. 28 (1979); *Dunn v. Commissioner*, 70 T.C. 715, 720 (1978); *Churchman v. Commissioner*, 68 T.C. 696, 701 (1977); *Jasionowski v. Commissioner*, 66 T.C. 312, 319 (1976); *Benz v. Commissioner*, 63 T.C. 375, 383 (1974). Petitioners' expectation of profit need not be reasonable, but petitioners must establish that they continued their activities with a bona fide intention and good-faith expectation of making a profit. Sec. 1.183–2(a), Income Tax Regs.; *Allen v. Commissioner, supra* at 33; *Jasionowksi v. Commissioner, supra* at 321; *Benz v. Commissioner, supra* at 383; *Bessenyey v. Commissioner*, 45 T.C. 261 (1965), affd. 379 F.2d 252 (2d Cir. 1967).

Section 1.183–2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit. These factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.

The issue is one of fact to be resolved not on the basis of any one factor but on the basis of all the facts and circumstances. Sec. 1.183–2(b), Income Tax Regs.; *Allen v. Commissioner, supra* at 34. See *Boyer v. Commissioner*, 69 T.C. 521 (1977), on appeal (7th Cir., July 7, 1978). Greater weight is to be given to objective facts than to petitioners' mere statement of their intent. Sec. 1.183–2(a), Income Tax Regs.; *Churchman v. Commissioner, supra* at 701.

Respondent contends, first, that the manner in which petitioners carried on their horse activities does not indicate that the activity was engaged in for profit. We disagree. What is relevant is whether petitioners maintained complete and accurate books and records, whether the activity was conducted in a manner substantially similar to other comparable businesses

which are profitable, and whether changes were attempted in order to improve profitability. Sec. 1.183–2(b)(1), Income Tax Regs. In this case, petitioners kept complete records of their horse operation. Although petitioners maintained one checking account for their horse operation, Dr. Engdahl's orthodontic practice, and their personal use, the horse activity expenses were posted to a separate ledger maintained solely for the horse operation. Receipts from horse breeding and sales were deposited in a savings account separate from other personal savings accounts maintained by petitioners. Petitioners' certified public accountant reviewed this recordkeeping and summarized the books quarterly. At the end of each year, petitioners' accountant prepared a summary recapitulation showing expenses broken down by items for each month which enabled Dr. Engdahl to keep track of monthly variations in expenses. Together, Dr. Engdahl and his accountant reviewed the summary sheets. It was the accountant's opinion that this accounting procedure was suitable for petitioners' operation. See *Farris v. Commissioner*, 31 T.C.M. 821, 41 P–H Memo T.C. par. 72,165 (1972).

Petitioners advertised their operation by exhibiting their horses at shows, advertising in horse show programs, newspapers, and a horsemen's magazine, and by word of mouth. Petitioners advertised their horses both for sale and breeding. See *Bishop v. Commissioner*, 31 T.C.M. 829, 41 P–H Memo T.C. par. 72,167 (1972); *Pennington v. Commissioner*, 26 T.C.M. 520, 36 P–H Memo T.C. par. 67,111 (1967). Compare *Golanty v. Commissioner*, 72 T.C. 411 (1979). Respondent asserts that petitioners' limited participation in horse shows during the years in issue belies any intent of making a profit. Petitioners' horses participated in 10 shows during the years in issue; petitioners relied on their professional trainer to show a horse after the horse's training was complete. While petitioners' reliance on their trainer may have been misplaced, we do not believe the facts indicate a lack of dedicated intent to make a profit.

Moreover, the record demonstrates that petitioners made changes in their operating methods in an effort to increase profitability. After boarding their horses for 3 years, petitioners purchased the Morgan Hill ranch to reduce expenses. Petitioners disposed of horses that did not meet petitioners' show or breeding expectations. In an attempt to upgrade the quality of their stock, petitioners bred their mares to champion stallions

owned by others and in 1965 bought a mare for $6,500. When petitioners became aware that their trainer was not using his best efforts to breed or show their horses, they brought the horses with which he was working back to the Morgan Hill ranch. Because petitioners could not afford to invest in the most expensive horses, they attempted to diversify by purchasing horses on speculation for resale. In light of these facts, we conclude that petitioners' manner of operation indicates an intent to make a profit.

Second, respondent argues that the type and quality of advice sought by petitioners was not indicative of an intent to engage in an activity for profit. Initially, petitioners discussed embarking upon a horse-breeding business with their two veterinarians, their trainer, and others involved in the business of breeding and showing horses. Petitioners were advised that the expected market for American saddle-bred horses was good. Petitioners received advice regarding stud fees and maintenance costs. Petitioners received and followed the advice given them with regard to purchasing property for the conduct of their operation. Petitioners consulted a certified public accountant as to record-keeping procedures, and petitioners have consistently followed the procedures outlined for them. While no formal market study of the market for American saddle-bred horses was conducted, we believe that petitioners' informal and continuous consultations with veterinarians, their trainer, and other horse breeders who are knowledgeable in this area demonstrates an intent to engage in a horse breeding business for profit. Compare *Golanty v. Commissioner, supra.*

Third, respondent asserts that petitioners had no expectation of asset appreciation. The facts, however, do not support respondent's allegation. The purchase price of the Morgan Hill ranch, including the cost of improvements made by petitioners, was $83,146. As of December 31, 1977, the fair market value of the ranch, based on its use as a horse ranch with residence thereon, was $225,000.[4] Moreover, petitioners' remaining horses as of December 31, 1977, had appreciated in value over cost by $18,750. The total appreciation in value may or may not offset

---

[4] Petitioners purchased the Morgan Hill property primarily for the purpose of breeding, raising, and selling horses. Thus, the holding of the land and the horse-related activities are considered a single activity for purposes of determining expected appreciation of value in assets under sec. 1.183–2(b)(4), Income Tax Regs. See sec. 1.183–1(d)(1), Income Tax Regs.; *Allen v. Commissioner,* 72 T.C. 28 (1979).

the aggregate operating losses incurred. Nonetheless, we believe that petitioners had a bona fide expectation that the assets used in their horse operation would increase; we further believe that the expectation was sufficient to explain their willingness to sustain continued operating losses. See *Allen v. Commissioner, supra;* compare *Golanty v. Commissioner, supra.*

Fourth, respondent points to petitioners' unremitting losses since 1964 as indicative that petitioners were not engaged in their horse-breeding activities for profit. We note, however, that a series of losses during the initial stage of an activity does not necessarily indicate that the activity was not engaged in for profit. Sec. 1.183–2(b)(6), Income Tax Regs. Moreover, losses sustained because of unforeseen or fortuitous circumstances beyond control of the taxpayer do not indicate that the activity was not engaged in for profit. Sec. 1.183–2(b)(6), Income Tax Regs. The start-up phase of an American saddle-bred breeding operation is 5 to 10 years. The years in issue fall within this start-up period. See *Farris v. Commissioner, supra.* In addition, petitioners' losses can be explained by a series of unfortunate events beyond their control. These events include a failure of the expected California market for American saddle-bred horses due to a shift in fashion among horse purchasers, medical problems with several of their horses, the untimely death of two of their chief hopes for setting up their breeding herd, failure of their trainer to devote his best efforts in breeding and showing their horses, and the rise in costs associated with maintaining and training horses.

As a result of these losses, petitioners made changes in their operation such as purchasing the Morgan Hill ranch and recalling their horses from their trainer. By the time of trial, petitioners realized they were not going to profit from their activity except for asset appreciation; consequently, they were attempting to sell the ranch. We believe this fact further indicates that petitioners conducted their horse operation with the intent to make a profit. See *Brown v. Commissioner,* 36 T.C.M. 77, 46 P–H Memo T.C. par. 77,015 (1977).

Respondent's fifth contention is that Dr. Engdahl's substantial income from his orthodontic practice indicates that the horse-breeding and showing activity was not engaged in for profit, especially since losses from the activity generated

substantial "tax benefits." Respondent points to section 1.183–2(b)(8), Income Tax Regs., which reads as follows:

(8) *The financial status of the taxpayer.* The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved.

Needless to say, such language cannot be construed as providing an additional reason to deny a deduction merely because the deduction is usable against other income. In cases of this kind, the concurrent existence of other income poses the question, rather than answers it. If there is no other income, there is no issue. As long as tax rates are less than 100 percent, there is no "benefit" in losing money. Properly construed, the regulation merely makes the commonsense point that the expectation of being able to arrange to have the tax collector share in the cost of a hobby may often induce an investment in such a hobby which would not otherwise occur. The essential question remains as to whether there was a genuine hope of economic profit. Petitioners established their horse operation with the hope of producing retirement income. Petitioners had no sizable investments or substantial source of income other than Dr. Engdahl's orthodontic practice. Petitioners' investment and hard work were not done with their children in mind—petitioners' children no longer lived at home by 1967. We think it unlikely that petitioners would embark on a hobby costing thousands of dollars and entailing much personal physical labor without a profit motive. See *Solomon v. Commissioner*, 26 T.C.M. 919, 36 P–H Memo T.C. par. 67,186 (1967).

Respondent's final contention is that petitioners received personal pleasure and recreational benefits from their horse activities which tends to indicate that petitioners did not engage in the activity for profit. Sec. 1.183–2(b)(9), Income Tax Regs. The facts, however, clearly do not support respondent's contention. After purchasing the Morgan Hill property, petitioners built the horse stalls, fences, and irrigation facilities themselves. For a number of years, petitioners have spent an average of 35 to 55 hours per week caring for the horses, mucking out stalls, and maintaining the horse facilities. Activities of this nature could hardly be called pleasurable. Moreover, petitioners do not

ride, nor do they use their ranch for social activities. While petitioners did occasionally attend social affairs at horse shows, they did not attend the horse shows for this purpose.

Viewing the record as a whole, we conclude that petitioners engaged in their horse activities with the bona fide intent to derive a profit, and, therefore, that the losses incurred in such activity during the years in issue are fully deductible and petitioners are entitled to the investment credits claimed with respect to these activities.

Accordingly,

*Decision will be entered for the petitioners.*