ROBERT SCOTT CRONHARDT AND DIANA MARGARET CRONHARDT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cronhardt v. Commissioner
Docket No. 24039-82.
United States Tax Court
T.C. Memo 1986-399; 1986 Tax Ct. Memo LEXIS 217; 52 T.C.M. (CCH) 287; T.C.M. (RIA) 86399; August 25, 1986. Robert Scott Cronhardt, pro se. David L. Lau, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' *219 1978 and 1979 Federal income taxes in the amounts of $15,439 and $18,111, respectively. The issues for decision are: (1) whether petitioners' rental of real property was an activity engaged in for profit; (2) whether petitioners' horse operations constituted an activity engaged in for profit; [1] and (3) whether petitioners' gain on the sale of their principal residence must be recognized. *220 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated by this reference. Petitioners resided in Rogue River, Oregon at the time they filed their petition in this case. Petitioner-husband worked for Ford Aerospace and Communications Corporation (Ford Aerospace). He planned to retire from Ford Aerospace in 1979 or 1980. Petitioners thought that their income would be insufficient after petitioner-husband retired. Thus, they decided that they would need a new source of income and that a horse ranch would provide the additional income they would need. In May 1971, petitioners purchased land in Rogue River, Oregon (the Oregon ranch) which they planned to use for a horse ranch after petitioner-husband retired. In September 1971, while petitioner-husband worked for Ford Aerospace, petitioners purchased a ranch in Morgan Hill, California (the California ranch). Petitioners resided at the California ranch until Ford Aerospace transferred petitioner-husband to Colorado in 1973. In October 1977, petitioners purchased a ranch in Peyton, Colorado (the Colorado ranch). Petitioner-wife *221 moved to the Oregon ranch in December 1978. Petitioners sold the Colorado ranch in January 1979. Petitioner-husband resigned from Ford Aerospace and moved to the Oregon ranch in February 1979. Rental Property
In May 1971, petitioners purchased the Oregon ranch which had 35 acres of land and a house. Petitioners rented the house and land separately; they rented the house to a tenant from 1971 to 1979 and the land to farmers from 1973 through 1978 as follows: Period
Usage
1973-1974
Field Crops and Cattle Grazing
1975-1976
Not rented
1977
Hay Production
1978
Cattle Grazing
In anticipation of moving to the property in 1980, petitioners made periodic improvements to the land as follows: Year
Improvements
1976
Underground irrigation system,
planting with orchard grass/clover
mix, pump/irrigation pipe
1977
Fence repair
1979
Cross fencing installation, barn/
arena construction
On Schedule F of their 1978 Federal income tax return, petitioners reported income and expenses from their rental operations as follows: Income
Rental of house and land
$ 1,960.00 Expenses
Repairs, maintenance
$ 253.00
Supplies purchased
451.00
Fuel (10,421 miles)
1,772.00
Taxes
109.00
Insurance
183.00
Freight, trucking
100.00
Land cleaning expenses
697.00
Abandonment-fence
1,393.00
Board and Lodging
345.00
Telephone
19.00
Airfare
333.00
Misc. Expenses
93.00
Depreciation (house & equipment)
$5,956.00
Total expenses
$11,704.00 Net Oregon Property Profit (Loss)
($ 9,744.00)
*222 On a separate Schedule F of their 1978 Federal income tax return, petitioners reported income and expenses from their horse activity at their Colorado ranch as follows: Peyton, Colorado Property
Income
Sales of Hay
$ 120.00 Expenses
Repairs, maintenance
$ 687.00
Feed purchased
1,288.00
Supplies purchased
399.00
Breeding fees
550.00
Vet. fees, medicine
1,271.00
Fuel (16,084 miles)
2,658.00
Taxes and licenses
46.00
Insurance
79.00
Utilities
371.00
Freight, trucking
687.00
Telephone
117.00
Dues and Subscriptions
48.00
Show Expense
135.00
Farrier
104.00
Board for horses
6,020.00
Labor-training
3,222.00
Advertising
266.00
$17,948.00
Depreciation
4,938.00
(on horses, property & equipment)
Total expenses
$22,886.00 Net Colorado Property Profit (Loss)
($22,766.00)
In 1979, the house remained rented but petitioners used the land for their horse operations. On Schedule F of their 1979 Federal income tax return, petitioners reported the combined income and expenses from the rental and horse operations as follows: Income
Sales of Hay
$ 860.00
Rental of House
800.00
Rent of Pasture
459.00
Sale of Colt
1,850.00
$ 3,969.00 Expenses
Repairs, maintenance
1,204.00
Feed purchased
1,314.00
Fertilizer, lime, chemicals
246.00
Supplies purchased
1,791.00
Breeding fees
1,100.00
Veterinary fees, medicine
1,045.00
Fuel
2,185.00
Taxes and Licenses
286.00
Insurance
425.00
Utilities
643.00
Freight, trucking
351.00
Board & Lodging
150.00
Casual labor
254.00
Equipment Rental
1,061.00
Advertising
1,166.00
Board of Horses
6,955.00
Training of Horses
5,785.00
Dues & Subscriptions
480.00
Depreciation
$8,072.00
(horses, house & equipment)
Total Expenses
$34,513.00 Net Oregon Property Profit (Loss)
($30,544.00)
*223 Horse Operations
Petitioners decided to acquire experience in various horse activities while petitioner-husband worked at Ford Aerospace and, to engage in horse operations full time after petitioner-husband retired. To acquire experience, petitioners purchased the California, Colorado and Oregon ranches. Petitioners resided and kept five horses, three appaloosas and two quarterhorses, at the California ranch. They also kept two horses at a breeding ranch in Idaho. In 1973, Ford Aerospace transferred petitioner-husband to Colorado. Petitioners sold the horses located at the California ranch and moved to a home in Colorado Springs, Colorado. The two horses located in Idaho were transported to Colorado and boarded at a horse ranch. Upon moving to Colorado, petitioners attempted to locate a ranch. In October 1977, petitioners purchased the Colorado ranch which had 15 acres. While in Colorado, petitioners purchased eight horses, sold four horses, and their horses had six foals. Petitioner-wife moved to the Oregon ranch on December 28, 1978 in anticipation of their entering the horse business full time. Petitioners sold their Colorado ranch on January 5, 1979. Petitioner-husband *224 lived in an apartment while he remained in Colorado to finish his assignment with Ford Aerospace. Upon completion of his assignment, he resigned from Ford Aerospace and moved to the Oregon ranch on February 5, 1979. At the California and Colorado ranches, petitioners performed the normal duties of cleaning stalls, grooming and feeding. They also purchased, sold and bred horses. The following chart reflects petitioners' horses which were foaled, purchased and/or sold: PURCHASE
DEPR.
SELLING
NET
NAME
($ )
DATE
($ )
($ )
DATE
($ )
Go's Elsano
400
(7/71)
250
(1/76)
(150)
Ring O'Fire
900
(8/71)
346
600
(12/74)
46 Miss Bammy Bar
500
(8/71)
900
Maya Monday
foal
(4/72)
350
(3/74)
350 About to Win
855
(5/72)
305
600
(9/75)
50 Nug Waggoner
655
(5/72)
148
400
(1/74)
(107)
Doc's Moonraker [2]
foal
(4/73)
3500
Miss Moonlight Jet
foal
(3/74)
417
725
(4/77)
1142 Shes Otoes Flash
1000
(11/74)
310
245
(4/77)
(445)
Melodys Mamie
2700
(8/75)
2700
Docs Marauder
foal
(3/76)
1850
(12/79)
1850 Tivio Prince
foal
(4/76)
800
(4/77)
800 Spanish Sin
2500
(7/76)
2083
put down
(10/82)
(417)
Docs Monarch
foal
(4/77)
5500
(10/80)
5500 Jans Melody
foal
(4/77)
4500
(1/80)
4500 Anna B Badger
2350
(5/77)
1899
750
(1/83)
299 Skips Gray Ghost
(5/77)
traded
(12/81)
for training
Skips Judy
1000
(5/77)
190
814
(10/78)
4 Skips Interest
1750
(6/77)
1100
1050
(1/83)
400 Skips Mary Ann
1000
(8/77)
489
650
(5/81)
139 Shasta Skipadoo
600
(9/77)
539
Mildady Doc
foal
(4/78)
A Skip Named Sue
foal
(3/79)
Moonrakers Star
foal
(5/79)
750
(5/81)
750 Moonrakers Bucky
foal
(3/80)
1850
(5/84)
1850 Docs Nomad
foal
(4/80)
Moonrakers Knight
foal
(4/80)
933
(5/82)
933 Skip To The Doc
foal
(6/80)
750
(5/81)
750 Docs Copper Cutter
foal
(4/81)
Docs Classy Sox
foal
(4/81)
1000
(7/84)
1000 Skippza Doll
foal
(5/81)
put down
(6/82)
Shasta Summer
foal
(5/81)
650
(1/83)
650 Bruces Moonraker
foal
(4/82)
traded
(2/84)
for training
Docs Cascade Lady
foal
(5/82)
775
(1/83)
775 Shastas Misty Lady
foal
(5/82)
Docs Cascade Bar
foal
(5/83)
Unnamed
foal
(3/84)
Unnamed
foal
(4/84)
Unnamed
foal
(4/84)
*225 Petitioners conducted horse breeding as follows: MARE
SIRE
FOAL
Miss Bammy Bar
(Purchased 8/71)
Docs Dynamo
Doc's Moonraker (4/73)
Cosmo Jet
Miss Moonlight Jet (3/74)
Docs Dynamo
Doc's Marauder (3/76)
Docs Dynamo
Doc's Monarch (4/77)
Docs Dynamo
Milady Doc (4/78)
Docs Wapati
Doc's Nomad (4/80)
Docs Wapati
Doc's Copper Cutter (4/81)
Docs Tivio Bar
Doc's Cascade Bar (5/83)
Melody's Mamie
(Purchased 8/75)
Poco Tivio
Tivio Prince (4/76)
Docs Moonraker
Jan's Melody (4/77)
Docs Moonraker
Moonraker's Buck (3/80)
Docs Moonraker
Bruce's Moonraker (4/82)
Docs Moonraker
Unnamed (4/84)
Spanish Sin
(Purchased 7/76)
None
(put to sleep)
Anna B. Badger
(Purchased 5/77)
Son O Skip
Skip's Gray Ghose (5/77)
Son O Skip
A Skip Named Sue (3/79)
Docs Moonraker
Moonrakers Knight (4/80)
Docs Moonraker
Docs Classy Sox (4/81)
Skip's Interest
(Purchased 6/77)
Docs Moonraker
Skippza Doll (5/81)
Skips Mary Ann
(Purchased 8/77)
Doc's Moonraker
Moonrakers Star (5/79)
Docs Moonraker
Skip to the Doc (6/80)
Shasta Skipadoo
(Purchased 9/77)
Doc's Moonraker
Shasta Summer (5/81)
Docs Moonraker
Shastas Misty Lady
Unnamed (3/84)
Milady Doc
(Foaled 4/78 from
Miss Bammy Bar)
Sir Skipa
Unnamed (4/84)
Go's Elsano
(Purchased 8/71)
Maya Monday (4/72)
*226 While petitioner-husband was employed by Ford Aerospace, petitioners worked 30 hours per week on their horse operations. They worked 55 hours per week on their operations after petitioner-husband retired. Petitioners maintained complete and accurate books and records of their activities. They culled their herd. They advertised through trade publications and by sending their prize horse to stallion parades. Petitioners reported the results of their horse operations on their Federal income tax return as follows: Year
Net Income
(Loss)
1971
(5,710)
1972
(7,731)
1973
(8,299)
1974
(10,573)
1975
(16,691)
1976
(17,314)
1977
(19,481)
1978
(32,484)
1979
(30,544)
1980
A loss, but the loss was less than
the year before
1981
A loss, but the loss was less than
in 1980
Petitioners' operations were impacted adversely by two events: petitioner-husband was transferred from California to Colorado in 1973 and their prize horse broke its leg in 1975. Petitioners shifted their emphasis from horse sales to horse and cattle boarding to make their operations profitable. Petitioners' adjusted gross income before taking into account their Schedule *227 F losses was as follows: Year
Amount
1978
$73,377
1979
$54,502
1980
Approximately $20,000
1981
Approximately $20,000
Deferred Gain on Sale of Principal Residence
Petitioners bought a house in Colorado on July 16, 1973 and a second residence in Colorado on October 4, 1977. They sold the first house for a gain on December 5, 1977. On their 1977 Federal income tax return petitioners claimed nonrecognition of the gain pursuant to section 1034. Petitioners conducted horse operations at their second residence. As part of their operations, they depreciated fencing, a barn and an outbuilding. They sold the second residence to its original owner on January 5, 1979, 13 months after the sale of the first house. Petitioners realized a gain on the sale of the residence including the depreciated property. On Form 2119 of their 1979 Federal income tax return, they claimed nonrecognition of the entire gain. ULTIMATE FINDINGS OF FACT Petitioners' rental of real property was not an activity engaged in for profit. Petitioners' horse operation was an activity engaged in for profit. OPINION The first two issues for decision are whether petitioners' rental *228 of real property and operations involving horses were activities engaged in for profit within the meaning of section 183. Section 183(a) [3] provides generally, if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as otherwise provided for in that section. Section 183(c) defines "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable * * * under section 162 or * * * paragraph (1) or (2) of section 212." Section 1.183-2(b), Income Tax Regs., provides a list of nine factors to consider in the determination of whether an activity is engaged in for profit. [4] However, the resolution of the issue is to be based on all the facts and circumstances. Engdahl v. Commissioner,72 T.C. 659, 666 (1979). In order for the taxpayer to prevail, the facts and circumstances must indicate that the taxpayer entered into, or continued, the activity with an actual and honest objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). *229 Rental Property
Petitioners purchased the Oregon property with the intention of using it for their horse operations when petitioner-husband retired from Ford Aerospace. Petitioners were able to rent the land to farmers in 1973, 1974, 1977 and 1978. The land was not rented in 1975 or 1976. During this two-year hiatus, petitioners upgraded the land in anticipation of their moving to it in 1980. Petitioners rented the house on the land from 1971 through 1979. [5]
Petitioners' concern for the property focused primarily on its future use as a horse farm. Its ability to generate rental income was fortuitous, and only of second importance. Although petitioners mitigated the carrying costs of the land from the time of purchase to the time they moved to Oregon through rent income and tax deductions, they did not enter into, or continue, the rental of the property with an actual and honest objective of making a profit. Horse Operations
*230 Petitioners wanted a steady income after petitioner-husband retired from Ford Aerospace in 1980. To effect their desire, they decided they would work full time in various horse related activities after petitioner-husband retired. They, however, did not want to begin their horse operations full time without first gaining some experience. Petitioners gained a great deal of experience at the California and Colorado ranches. They participated in the daily chores and bred, purchased and sold horses. Petitioners' efforts to gain experience prior to undertaking the activities full time are an indication that their activities were engaged in for profit. At each of their ranches, petitioners carried on their activities in a business like manner. They kept complete and accurate books and records. They culled their herd. They advertised through trade publications and by sending their prize horse to stallion parades. Finally, they took steps to make their business profitable by shifting their emphasis from horse sales to horse and cattle boarding. Petitioners expended a substantial amount of time and effort in carrying on their horse operations. They worked 30 hours per week on their *231 horse activities while petitioner-husband was employed by Ford Aerospace and 55 hours per week after they moved to the Oregon ranch. Although petitioners' operations have a history of losses, petitioners' operations were impacted adversely by petitioner-husband's transfer to Colorado and their prize horse's suffering a broken leg. Petitioners' largest losses occurred in 1978 and 1979. These large losses, however, can be attributed in part to petitioners' shifting their operations from part time to full time and the nonrecurring expenses associated with this transition. The losses began to decrease in the years immediately following 1978 and 1979. Finally, although petitioners had an adjusted gross income, before taking into account their Schedule F losses, of $73,377 and $54,502 in 1978 and 1979, respectively, their income decreased dramatically after petitioner-husband retired from Ford Aerospace. Thus, petitioners' financial status does not clearly indicate whether or not petitioners' operations were engaged in for profit. Based on the entire record, we find that petitioners' horse operations were engaged in for profit. Deferred Gain on Sale of Principal Residence
*232 Realized gains on the sale or exchange of property are generally recognized. Section 1001(c). An exception to the general rule is that realized gains are not recognized if they result from the sale or exchange of a principal residence pursuant to section 1034. Section 1034(a), as in effect in 1979, provided in relevant part: (a) Nonrecognition of Gain. -- If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him and, within a period beginning 18 months before the date of such sale and ending 18 months after such date, property (in this section called "new residence") is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price * * * of the old residence exceeds the taxpayer's cost of purchasing the new residence. Section 1304(d)(1), however, renders subsection (a) inapplicable if petitioners utilized the nonrecognition provisions of section 1034 within the 18 month period prior to the sale of their second residence. [6] Section 1034(d)(1). Furthermore, the limitation in section 1034(d)(1) does not apply, *233 and the realized gain in question is not recognized, if section 1034(d)(2) applies. Subsection (d)(2) provides: (d) Limitation. -- * * * (2) Subsequent Sale Connected With Commencing Work at New Place. -- Paragraph (1) shall not apply with respect to the sale of the taxpayer's residence if -- (A) such sale was in connection with the commencement of work by the taxpayer as an employee or as a self-employed individual at a new principal place of work, and (B) if the residence so sold is treated as the former residence for purposes of section 217 (relating to moving expenses), the taxpayer would satisfy the conditions of subsection (c) of section 217 (as modified by the other subsections of such section). Section 217 (c) provides: (c) Conditions for Allowance. -- No deduction shall be *234 allowed under this section unless -- (1) the taxpayer's new principal place of work -- (A) is at least 35 miles farther from his former residence than was his former principal place of work, or (B) if he had no former principal place of work, is at least 35 miles from his former residence, and (2) either -- (A) during the 12-month period immediately following his arrival in the general location of his new principal place of work, the taxpayer is a full-time employee, in such general location, during at least 39 weeks, or (B) during the 24-month period immediately following his arrival in the general location of his new principal place of work, the taxpayer is a full-time employee or performs services as a self-employed individual on a full-time basis, in such general location, during at least 78 weeks, of which not less than 39 weeks are during the 12-month period referred to in subparagraph (A). For purposes of paragraph (1), the distance between two points shall be the shortest of the more commonly traveled routes between such two points. In the present case, section 1034(d)(1) would, but for subsection (d)(2), apply because petitioners utilized section 1034 when *235 they sold their first house -- 13 months prior to selling their second residence. However, subsection (d)(2) applies. Subsection (d)(2)(A) is met because petitioners sold their second residence in connection with their move to Oregon to become self-employed in their full-time horse business. Subsection (d)(2)(B) is met because petitioners move from Colorado to Oregon meets the 35-mile distance requirement of section 217(c)(1) and petitioners activities lasted at least through 1981 which satisfies the 24-month time requirements of section 217(c)(2). Because section 1034(d)(2) applies, section 1034(d)(1) does not apply and section 1034(a) applies. The realized gain on the sale of petitioners' principal residence is not recognized. Finally, to the extent any assets in the sale were not part of petitioners' principal residence and were part of petitioners' horse operations, section 1034 does not apply, e.g., any gain is realized from the sale of the depreciated fencing, barn, and outbuilding. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Respondent disallowed investment tax credits in 1978 and 1979 on equipment and structures petitioners utilized for their horse operations. Respondent disallowed petitioners' 1978 moving expense deduction.The expenses were incurred when petitioners moved from Colorado to Oregon to start their horse operations full time. Respondent disallowed the investment tax credits and moving expense deduction because petitioners' horse operation was not an activity engaged in for profit. See sections 38 and 217. Thus, the resolution of these issues is controlled by our determination in issue 2. In a related case involving the taxable years 1980 and 1981, respondent disallowed losses from petitioners' horse operations because he contends that they were not engaged in for profit. For the taxable years 1980 and 1981 which are now docketed in this Court, the parties have stipulated to be bound by the relevant findings of fact and conclusions of law of this opinion.↩
2. The parties have spelled Doc's Moonraker with and without an apostrophe. We use the spelling the parties use in the stipulation of facts.↩
3. All references to sections are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue. ↩
4. The factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.↩
5. It appears that the rental property involved two separate activities: the rental of land and the rental of a house. Neither party has raised this issue and, consequently, we analyze the rental operations as a single activity.↩
6. In 1979, subsection 1034(d)(1) provided: (d) Limitation. -- (1) In General. -- Subsection (a) shall not apply with respect to the sale of the taxpayer's residence if within the 18 month period before the date of such sale the taxpayer sold at a gain other property used by him as his principal residence, and any part of such gain was not recognized by reason of subsection (a).↩