FLOIS D. BURROW AND DEBORAH A. BURROW, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Burrow v. Commissioner
Docket No. 919-89
United States Tax Court
T.C. Memo 1990-621; 1990 Tax Ct. Memo LEXIS 694; 60 T.C.M. (CCH) 1402; T.C.M. (RIA) 90621; December 11, 1990, Filed *694 Decision will be entered for the petitioners. S. Douglas Trolson and Robert J. Milford, for the petitioners. Timothy *695 S. Sinnott, for the respondent. CLAPP, Judge. CLAPP
*2022 MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: *2023 Additions to tax under section
Year
Deficiency
6653(a)(1)(A) *
6653(a)(1)(B) *
6661(a)
1982
$  5,595
$   279.75
** $  1,357.50
1983 19,603 980.15
** 4,901.00
1984 35,091
1,754.55
** 8,772.75
1985 43,235
2,161.75
** 10,808.75
After a concession by respondent, the issues for decision are (1) whether petitioners' horse breeding operation constituted an activity engaged in for profit; (2) whether petitioners are entitled to an investment tax credit for taxable years 1982 and 1984 for assets used in their horse breeding operation; and (3) whether petitioners are liable *696 for additions to tax under sections 6653(a)(1) and (2) and 6661(a). All section references are to the Internal Revenue Code for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioners Flois D. Burrow (Mr. Burrow) and Deborah A. Burrow (Mrs. Burrow) resided in Noblesville, Indiana at the time they filed their petition. Mr. Burrow was a successful businessman who organized two corporations in the 1970's, Burco Molding, Inc. (Burco) and King Systems Corporation (King Systems). After several formative years, both of these corporations became profitable under Mr. Burrow's direction. King Systems operated at a loss for 13 years until it finally became profitable. Mr. Burrow was an executive officer of Burco and owned 41 percent of its outstanding stock. For the taxable years in issue, petitioners received gross income from Burco in the amounts of $ 113,948, $ 119,100, $ 256,975, and $ 202,002, respectively. In addition to these businesses, petitioners owned and operated a horse farm for breeding and selling Arabian horses. Although *697 Mr. Burrow received a substantial salary from Burco, this corporation did not have a retirement plan. He considered the horse breeding business as a way to generate income for his retirement. In 1982, petitioners purchased their first stallion and mare and bred them for a 1983 foal. This foal died, but the mare was bred with another stallion stabled in Michigan for a 1984 foal. In 1983, petitioners purchased a one-fortieth interest in a syndicated stallion, Mr. Brilliant, for $ 15,000. The purchase of this interest entitled petitioners to two breedings per year for the life of the stallion. Petitioners maintained insurance on some of their horses during the years 1982 through 1986. After 1986, none of petitioners' horses were insured. During taxable years 1982, 1983, 1984, and for the first 11 months of 1985, petitioners reported the income, expenses, and resulting net losses relating to their horse breeding operation on Schedule C, Profit or (Loss) From Business or Profession. On December 2, 1985, petitioners incorporated an entity known as Canterbury Arabians Corporation (Canterbury). This corporation elected subchapter S status. The corporation issued 201 shares of stock. *698 Mr. Burrow owned 101 shares of the stock, while Mrs. Burrow owned the remaining 100 shares. For the last month of 1985 and for all subsequent taxable years, Canterbury reported the income, expenses, and resulting net losses pertaining to its horse breeding operation on Form 1120S, U.S. Income Tax Return for an S Corporation, and petitioners deducted the corresponding net losses incurred by Canterbury on their income tax returns. For the years in issue, petitioners and Canterbury incurred net losses totaling $ 220,975. Petitioners and Canterbury reported gross receipts, expenses, and resulting net losses pertaining to their horse breeding operation as follows: Schedule C  Year
Gross Receipts
Expenses
Losses 1982
-0-
$ 10,860 ($ 10,860)
1983
$    85
47,844 (  47,759)
1984
1,203
72,711 (  71,508)
1985
7,960
75,120 (  67,160)
Form 1120S  1985
$   394
$ 24,082
( $ 23,688)
An itemization of petitioners' and Canterbury's gross receipts from their horse breeding operation for the years 1982 through 1988 follows: *2024 Year
Board/Lessons
Training
Breeding
Horse Sales
Misc.
Total
1982
-- --
--
-- --  --   1983
-- --
--
-- $    85.00
$    85.00 1984
$  1,203.00
--
--
-- --  1,203.00 1985
8,354.00
--
--
-- --  8,354.00 1986
22,691.00
$ 3,200.00
--
-- 2,402.81
28,293.81
1987
23,019.00
1,600.00
--
1,300.64
25,919.64
1988
18,838.61
9,404.49
$ 300.00
$ 13,500.00
657.14
42,700.24
*699 Mr. Burrow had owned half-Arabian horses for nearly 12 years prior to the formation of Canterbury; however, neither he nor Mrs. Burrow had ever raised or sold purebred Arabian horses prior to 1982. Petitioners recognized their need to gain as much knowledge as possible about their new venture. During 1982 and 1983, petitioners subscribed to various publications pertaining to the purebred Arabian horse industry, purchased and reviewed microfiche records from the Arabian Registry that contained the breeding records of all Arabian horses registered in this country, attended horse shows, and consulted with various experts in the Arabian horse industry. Mrs. Burrow took horseback riding lessons so that she could show and promote their horses in the show ring, and she worked part time at the farm. She also participated in Arabian horse shows to promote their horses and to become better acquainted with people in the horse industry. During 1983, petitioners advertised two of their horses in an Indiana horse association magazine. One horse was advertised for future breeding and to generate breeding fees to petitioners, and the other horse was advertised to promote its show record. *700 In 1984, Mr. Burrow designed and helped build a barn to house a stable, riding arena, and office area. It had 17 stalls, a 62 by 125 foot indoor arena, an observation deck, and an enclosed observation room. This barn was owned by petitioners personally and did not become an asset of Canterbury in 1985. During 1984, petitioners hired a trainer to train their horses and to provide riding lessons to the public. They also hired Mrs. Burrow's sister to work approximately 1 day per week. Mrs. Burrow began working full time on the farm in 1984 and did most of the daily activities, including grooming, vaccinating and worming the horses, cleaning the stalls, and bookkeeping. Mr. Burrow continued to work full time at Burco but devoted 6 evenings a week and Sundays to the horse breeding operation. In 1984, 1985, and 1986, Mrs. Burrow attended seminars at Purdue University on the horse breeding industry, and in 1985, 1986, and 1987, she attended horse training clinics in Illinois, Colorado, and Ohio. In 1985, after the formation of Canterbury, petitioners' accountant began preparing quarterly financial statements. Prior to incorporation, petitioners' accountant prepared financial statements *701 on an annual basis solely for purposes of filing income tax returns. In 1985, petitioners hired their first groom on a part-time basis. Petitioners had no full-time employees until 1986. In 1985, Mrs. Burrow suffered a severe injury when she was kicked in the thigh by a horse, which resulted in her being unable to show horses or attend horse shows for that summer. During the years at issue, petitioners' Arabian horse breeding operation produced no income from the sale of horses or from breeding fees. Petitioners financed this operation with Mr. Burrow's income from Burco. It was not until 1988 that Canterbury sold any horses and produced breeding income. The demand and market price for Arabian horses had increased steadily between the years 1969 and 1984. However in 1985, the Arabian horse market declined somewhat and it crashed during the years 1986 through 1988. OPINION The issues are (1) whether petitioners' horse breeding operation constituted an activity engaged in for profit; (2) whether petitioners are entitled to an investment tax credit for taxable years 1982 and 1984 for assets used in their horse breeding operation; and (3) whether petitioners are liable for *702 additions to tax under sections 6653(a)(1) and (2) and 6661(a). Section 183(a) provides generally that if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as otherwise provided in this section. Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable * * * under section 162 or under paragraph (1) or (2) of section 212." In order to find that an activity was engaged in for profit under section 183, it must be established that the taxpayer had an actual and honest objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be reasonable. However, the taxpayer must enter into the activity, or continue it, with the objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.
*703 Section 1.183-2(b), Income Tax Regs., provides nine factors to consider in determining whether an activity is engaged in for profit. The factors are (1) the manner in which taxpayer *2025 carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. The issue is to be resolved on the basis of all the facts and circumstances. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). Respondent contends that petitioners did not engage in their Arabian horse breeding operation with the requisite objective to make a profit. We disagree. First we consider *704 whether petitioners conducted their operation in a businesslike manner. We believe they did. Although petitioners did not maintain a separate bank account, Mrs. Burrow kept complete and accurate records of all expenditures relating to the horse breeding operation. Respondent has accepted petitioners' report of income and expenditures but questions only the profit objective with respect to their activities. After petitioners incorporated Canterbury, they received quarterly financial statements from their accountant. Petitioners did extensive advertising to publicize their business and to attract clients. They prepared a promotional videotape for prospective customers, advertised their operation in horse publications, exhibited their horses at shows, and sponsored classes at horse shows. They also provided horseback riding lessons and horse training courses in an attempt to generate public interest and to earn additional income. When petitioners began their horse breeding operation, Mr. Burrow had been interested in horses for many years. Although he had never been involved in breeding horses, he had bought and sold half-Arabian horses and had acquired a knowledge of what constitutes *705 a quality Arabian horse. The philosophy with which he approached the horse breeding operation was the same philosophy that he used in ensuring the success of his molding corporations. He believed that the operation would be profitable if petitioners developed a high quality breed of horses. Mrs. Burrow had no knowledge of horse breeding, but she went to great lengths to develop her expertise in this area. She subscribed to and studied numerous publications, researched the pedigree records of Arabian horses in this country to determine which bloodlines would produce superior horses, and attended horse shows and horse breeding clinics and seminars throughout the country. We believe that petitioners' lack of personal expertise at the beginning of their activities was more than offset by the knowledge they acquired from their consultations with people in the industry and their independent investigations conducted throughout the course of their horse breeding activities. Petitioners sought the advice of notable, experienced horse breeders. They presented two credible witnesses, Jim Hall and Paul Husband, each of whom had been in the Arabian horse business for over 20 years and had *706 worked with petitioners during the early stages of their horse breeding operation. Both witnesses testified that it takes time to build up a breeding herd and develop horses that have the reputation and qualities that make them salable as outstanding Arabian horses. They testified that petitioners had a thoughtfully prepared business plan -- one that was designed to minimize losses and to allow petitioners to learn as the business progressed. Preparation for an activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein indicates that the taxpayer had entered into the activity for a profit. Sec. 1.183-2(b)(2), Income Tax Regs.
During the years in issue, Mr. Burrow continued to work full time at Burco. In 1984, he began working on the farm in the evenings 6 nights a week and during the day on Sunday. Mrs. Burrow took a more active role in the day-to-day operation of the business and spent a substantial amount of time on the farm. In 1984, she worked 8 to 10 hours each day. In 1985 *707 and 1986, she worked 12 to 14 hours each day. Much of the work she performed was laborious and tedious, such as grooming, vaccinating and worming the horses, and cleaning the stable. She did the bookkeeping and maintained breeding and medical records. We conclude that petitioners devoted a significant amount of time and effort to the activities of the farm. We next consider whether petitioners expected that the assets they used in their Arabian horse breeding operation would increase in value. Petitioners intended to make a profit by developing for breeding a superior quality stock of Arabian horses. After studying various bloodlines of horses, they decided to breed the McCoy line of Arabian horses. The McCoy line of horses were renowned throughout the United States for their beauty, size, and athletic ability. The herd that petitioners gradually developed was of good quality, and some of their horses were capable of producing national champion caliber offspring. Petitioners expected that their horses would appreciate in value as their herd continued to grow and develop into a more esteemed reputable stock. Mr. Burrow demonstrated his business acumen with the incorporation *708 of two successful molding businesses. He was a substantial shareholder *2026 and executive officer in one of the corporations. Under his guidance, both of these businesses became profitable. Mr. Burrow applied the same business acumen and approaches used in these businesses to the horse breeding operation. Ellis v. Commissioner, T.C. Memo. 1984-50. Petitioners sustained a loss in every year since they became involved in the horse breeding business. During the years at issue, their horse activities produced no income from the sale of horses or in the form of breeding fees. Petitioners did not sell their first horse until 1988. Respondent points to these losses as indicative that petitioners were not engaged in their horse breeding activity for profit. A history of losses may be an indication that an activity is not engaged in for profit. However, when losses are incurred during the initial or early stages of an activity, it is not necessarily an indication that the activity was not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs.; *709 Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). We believe that petitioners' losses in the years in issue are understandable and not determinative of a lack of a profit objective. The years in issue, 1982, 1983, 1984, and 1985, fall within the early period of petitioners' horse breeding activity. Farris v. Commissioner, T.C. Memo. 1972-165; Foster v. Commissioner, T.C. Memo. 1973-14. Petitioners began their horse breeding operation in 1982 with the purchase of a single mare and stallion. They chose not to purchase a larger number of horses in the first year and decided instead to develop their herd gradually. Theirs was a conservative approach designed to minimize expenses, but it required a longer period in which to generate profits. Petitioners' expert witnesses testified that petitioners' approach was similar to other successful Arabian horse farms, and that in due course petitioners' operation should be profitable. Petitioners' witness, Mr. Hall, questioned whether it is accurate to characterize petitioners' investment as a loss. He noted that petitioners have acquired *710 very valuable assets -- the horses and the barn -- and that consideration must be given to the considerable amount that these assets are worth. Thus, under the facts of this case, the fact that petitioners sustained a loss each year does not indicate that their horse breeding operation was not engaged in for profit. While petitioners had substantial income from Mr. Burrow's employment at Burco, we believe that they intended to generate a profit from their horse breeding operation. Respondent argues that petitioners' tax benefits, derived from the losses they sustained as a result of their operation coupled with the personal pleasure and recreation they received, demonstrates their lack of an objective to achieve a profit. In Engdahl v. Commissioner, 72 T.C. 659, 670 (1979), this Court pointed out that "As long as tax rates are less than 100 percent, there is no 'benefit' in losing money. * * * The essential question remains as to whether there was a genuine hope of economic profit." As in Engdahl, petitioners only source of income was from Mr. Burrow's businesses. Also as in Engdahl, petitioners received no dividends or investment income that could *711 be allocated to fund their horse breeding operations. The losses generated by their horse breeding operations reduced the amount of their disposable income. We doubt that such losses were a benefit to petitioners. Petitioners established their horse operation with the hope of generating retirement income. They spent many hours researching and publicizing this venture and performing the daily tasks of the farm. Finally, the facts clearly do not support respondent's contention that petitioners derived recreation and personal pleasure from their horse breeding operation. Although petitioners admitted that they enjoyed raising horses, enjoyment of one's work is not inconsistent with a profit objective. There is nothing in the record to indicate that petitioners ever rode their horses as a leisure activity. This Court does not consider such labor-intensive activities as cleaning stalls, worming horses, and maintaining horse facilities as pleasurable. Based on the record as a whole, we conclude that petitioners did engage in their horse breeding operation with the actual and honest objective of making a profit. Therefore, the losses incurred in connection with such activities *712 during the years in issue are fully deductible, and petitioners are entitled to the investment credits claimed in 1982 and 1984 with respect to their activities. Since petitioners have prevailed on the only substantive issue, they are not liable for the additions to tax under sections 6653(a)(1) and (2) and 6661(a). Decision will be entered for the petitioners. Footnotes
*. For the years in issue, the correct code section is section 6653(a)(1) and (2).↩
**. 50 percent of the interest due on the deficiency.↩