T.C. Summary Opinion 2003-6


UNITED STATES TAX COURT


CHARLIE DANIEL TURNER, JR. AND SANDRA LOVELL TURNER,
Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13082-99S.                    Filed January 24,2003.


Charlie Daniel Turner, Jr. & Sandra Lovell Turner, pro sese.

Linda J. Wise, for respondent.


CARLUZZO, Special Trial Judge:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed.  Unless otherwise indicated, subsequent section references are to the Internal Revenue Code in effect for the years in issue.  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.

Respondent determined deficiencies in and an addition to petitioners' Federal income taxes as follows:

| Year | Deficiency | Sec. 6651(a)(1) |
|------|-----------|-----------------|
| 1994 | $10,909 | -- |
| 1995 | 11,571 | $2,322 |
| 1996 | 6,828 | -- |

The issues for decision are: (1) Whether expenses listed on Schedule C, Profit or Loss From Business, included with petitioners' Federal income tax return for each year in issue were incurred in an activity for profit; (2) whether income received and expenses incurred during 1994 by petitioners' daughter are properly reportable on petitioners' return for that year; and (3) whether petitioners had reasonable cause for failing to file a timely 1995 return.

Background

Some of the facts have been stipulated and are so found. Petitioners are husband and wife. They filed a joint Federal income tax return for each year in issue. At the time the petition was filed, petitioners resided in Ardmore, Alabama. References to petitioner are to Charlie Daniel Turner.

Petitioner has a doctorate in aerospace engineering. At all relevant times he was employed on a full-time basis as an aerospace engineer by Nichols Research Corporation (Nichols Research). He was required to travel extensively in connection with this employment. His traveling expenses, including

transportation expenses, were paid or reimbursed by his employer.

During the summer of 1991, several close friends of petitioners' son were killed in an automobile accident. Petitioners' son was supposed to have been with his friends at the time, but wasn't. In December of that year, petitioners' residence and much of its contents were destroyed by fire. These two events had a significant effect on petitioners' lives and lifestyle. Petitioner described the above tragedies as "an unhappy string of events" that led him and his wife "to the conclusion that * * * [they] needed to get more out of life before it was too late." Petitioners' catharsis began with an "automotive buying spree" that included several "performance" cars, including a 1965 Mustang and two Firebirds, one for petitioner and one for his son.[1]

Petitioner's interest in performance cars, especially Ford Mustangs, led him to open-road racing,[2] a form of automobile racing that he first learned about in a magazine article. In 1992, petitioner established Turtle Performance, an unincorporated association, in order to pursue his interests

---

[1] See Lawrence, "Mustang Lifestyles: Terminal Velocity", Mustang Monthly, 94 (Oct. 1994).

[2] This is a form of car racing that involves driving over a 90 mile stretch of a public highway that has been closed to traffic. In the unlimited class, the car that completes the course in the least amount of time is the winner.

in performance automobiles and, apparently, speed.  At first, petitioner maintained a separate checking account and credit card account for Turtle Performance; however, by the years in issue, expenditures attributable to Turtle Performance were paid from or charged to petitioners' personal accounts.

During the years in issue, a typical open-road race event required an entry fee of $600 (more or less), but there were no cash prizes for the class winners.  Entrants apparently competed for trophies and "bragging rights".  Eventually, petitioner founded the National Open Road Race Association (NORRA) to publicize the sport.

Steeda Autosports (Steeda) is one of several nationally known after-market performance tuners of Ford automobiles. Steeda is located in Pompano Beach, Florida, and offers its products and services to the general public.  In November 1992, in what is described as an "uncharacteristic surge of spontaneity",[3] petitioner ordered a 1993 Mustang Cobra from a Ford dealer, but had the car shipped directly from Ford's Dearborn assembly plant to Steeda.  Petitioner intended to compete in open-road racing with this car and to this end directed that Steeda make certain modifications to the stock Mustang.  The modifications were made and sometime during 1993

---

[3] See id.

the Mustang was delivered to petitioner. The Mustang was street legal and used by petitioners for personal purposes, but it was modified by Steeda pursuant to petitioner's specifications so that it could be used to compete in open-road racing.

Petitioner decided that the value of the Mustang, or similarly modified Mustangs, depended upon the car's ability to perform. Petitioner's goal was to set the land speed record for a street-legal car on a public highway. To this end, he entered the Mustang in various open-road racing events during the years in issue. At first the events were few and far in between-- twice a year on desert highways in Nevada. Later, the events were held three or four times a year on rural highways in Texas as well as in Nevada. Petitioner lived in Alabama at the time. He owned a trailer and tow vehicle (Chevrolet Suburban) capable of transporting the Mustang, and he either drove or towed his Mustang to the racing events. Occasionally, petitioner leased the Suburban and trailer to others, mostly friends or acquaintances who used the equipment to transport cars to various racing or track testing events. From time to time the location of a racing event coincided with a business trip that petitioner was required to make as an employee of Nichols Research. When this occurred petitioner was reimbursed for his traveling expenses by his employer.

Petitioner attempted to generate publicity for his modified Mustang by writing articles and info-ads for various automobile periodicals. Following the years in issue, he offered the Mustang for sale. In one advertisement, petitioner indicated that he had invested $38,000 in the car and would "consider reasonable [offers]". Later, after the examination that led to this case began, petitioner advertised the car for sale at prices that varied depending upon the anticipated speed achievements of the car. For example, if the car was sold "ready for its next test run" then the price would be $250,000, but if the car set the record sought by petitioner, it would be offered for sale at $1,000,000. According to an article in the August 1998 edition of Car and Driver, the current version of a Steeda modified Mustang (then designated the "Steeda Q") sold for approximately $41,000, including the cost of the Mustang and Steeda modifications. See Webster, Car and Driver, 60 (Aug. 1998).

On August 6, 1996, petitioner was seriously injured in a motorcycle accident. He was hospitalized until October 15, 1996. He was unable to walk without assistance until December 31, 1996, the date of his daughter's wedding. He returned to work for Nichols Research sometime in January 1997.

In November 1996, shortly after petitioner was released from the hospital, Mrs. Turner was diagnosed with a serious illness. She was involved with planning her daughter's wedding at the

time.  She received medical attention for her illness until the
middle of 1997.

Petitioners' 1994 and 1996 joint Federal income tax returns
were timely filed.  Taking into account extensions, their 1995
joint Federal income tax return was due on or before October 15,
1996, but it was not filed until March 25, 1997.  Each return
includes a Schedule C for Turtle Performance.  The following
items are reported on the Schedules C:

| Year | 1994 | 1995 | 1996 |
|------|------|------|------|
| Income | $15,294 | $22,505 | $18,060 |
| Total expense deductions | (59,739) | (73,079) | (56,727) |
| Net profit or (loss) | (44,445) | (50,574) | (38,667) |

The income for 1994 is attributable to leasing fees charged for
the use of petitioners' tow vehicle and trailer.  For the most
part, the incomes reported for 1995 and 1996 consist of travel
expense reimbursements petitioner received from Nichols Research.
Some of the travel expense deductions claimed on the Schedules C
involve those trips when an open-road racing event coincided with
petitioner's travel obligations as an employee of Nichols
Research.

On Schedules C included with their Federal income tax
returns from 1992, the year that Turtle Performance was

established, through the years in issue, until 1999, petitioners reported net losses totaling over $405,000 from that activity. The activity did not generate a profit in any of those years.

In 1994 petitioners' daughter was employed to some extent as a model and actress. The income and expenses attributable to petitioners' daughter's employment are reported on petitioners' 1994 return.

The examination of petitioners' returns for the years in issue began not later than October 23, 1997.[4] In the notice of deficiency that resulted from the examination of those years respondent disallowed the loss attributable to Turtle Performance claimed for each year because, according to respondent, the activity was not engaged in for profit in any of those years. For 1994, respondent also determined that petitioners improperly included their daughter's income and expenses on their return. Respondent further determined that petitioners did not have reasonable cause for failing to file a timely 1995 return.

Discussion

According to petitioners, Turtle performance is, and was at all relevant times, a trade or business. Therefore, petitioners argue, the expenses and/or losses incurred in that activity are

---

[4] The provisions of sec. 7491 are therefore not applicable.

deductible under section 162 and/or section 165.[5] Respondent argues that Turtle Performance was not a trade or business during any of the years in issue because petitioner did not engage in that activity with the requisite profit objective. According to respondent, expenditures attributable to that activity are only deductible as allowed by section 183.[6] For the following

---

[5] In general, sec. 162 allows a deduction for all ordinary and necessary expenses incurred in carrying on a trade or business. In the case of an individual, sec. 165(c)(1) generally allows a deduction for any losses incurred in a trade or business.

[6] In relevant part, sec. 183 states:

(a) General Rule.--In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed--

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

(continued...)

reasons, we agree with respondent.

The term "trade or business" is not precisely defined in the Internal Revenue Code or the regulations promulgated thereunder; however, it is well established that in order for an activity to be considered a taxpayer's trade or business for purposes relevant here, the activity must be conducted "with continuity and regularity" and "the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). After careful consideration, we are not persuaded that petitioner's primary purpose for engaging in Turtle Performance was for income or profit.

The test of whether a taxpayer conducted an activity for profit is whether he or she entered into, or continued, the activity with the actual or honest objective of making a profit. See Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without

---

[6](...continued)

(c) Activity Not Engaged In For Profit Defined.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

We note that for years 1995 and 1996 income reported on the Schedules C actually includes employee business expense reimbursements improperly characterized as income from Turtle Performance.

published opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. The taxpayer's profit objective for each year in which the activity is conducted must be bona fide, taking into account all of the facts and circumstances. See Keanini v. Commissioner, supra at 46; Dreicer v. Commissioner, supra at 645; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981); Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); sec. 1.183-2(a) and (b), Income Tax Regs. More weight is given to objective facts than to the taxpayer's statement of his intent. See Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a), Income Tax Regs.

The following factors, which are nonexclusive, are considered in the determination of whether an activity is engaged in for profit: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. See sec. 1.183-

2(b), Income Tax Regs.

No one factor is determinative in and of itself, and our conclusion with respect to petitioner's profit objective does not depend upon merely counting those factors that suggest the presence of a profit objective and comparing that number to the number of factors that indicate the opposite. See id.

We see little benefit in specifically discussing each factor. Instead, attached as an Appendix to this opinion is the article from Mustang Monthly, previously cited in this opinion. The article discusses petitioner's background, the circumstances surrounding the acquisition of his modified Mustang, open-road racing in general, petitioner's involvements and achievements in the sport, and to some extent, petitioner's future plans. The article was received into evidence as petitioners' exhibit and compels us to reject their contention that Turtle Performance was a trade or business during the years in issue.

Petitioners point to the amount of time and money petitioner has spent in connection with Turtle Performance and argue that both are indicative of a profit objective. As we view the matter, the time that petitioner put into the activity, given his obvious interest in performance cars, is no more indicative of a profit objective than a passionate pastime. Similarly, the money expended suggests little other than to confirm what is commonly

acknowledged; that is, car racing at any level is an expensive proposition.[7] Lastly, giving little weight to petitioner's offer to sell the Mustang at prices that increased based upon the accomplishments achieved, we have serious doubts whether the value of the Mustang would ever exceed the cumulative losses incurred by petitioners over the history of Turtle Performance. It follows that respondent's adjustments disallowing the net loss claimed on the Schedule C for Turtle Performance for each year in issue are sustained.

Petitioners' 1994 return also includes a Schedule C reporting income earned and expenses incurred by their minor child. Respondent determined that neither the income nor the expenses are properly reported on petitioners' joint return. We agree. In general, amounts received in respect of services rendered by a child are includable in the child's income and not in the income of the child's parents. Sec. 73(a). Furthermore, expenditures attributable to such income are generally treated as paid or incurred by the child. Sec. 73(b). Respondent's adjustments in this regard are therefore sustained.

Taking into account successive extensions, petitioners' 1995 joint Federal income tax return was due on or before October 15,

---

[7] The late Colin Chapman, founder and guiding force of Lotus Cars, Ltd., is rumored to have said that he made a small fortune from automobile racing. The problem, according to Mr. Chapman, was that when he started racing he had a large fortune.

1996, but not filed until March 25, 1997. See secs. 6072, 6081. According to petitioners, the addition to tax that would otherwise result from their failure to file a timely return is not applicable because the failure was due to reasonable cause, namely the poor health of each, and not due to willful neglect. See sec. 6651(a)(1).

Petitioner was seriously injured in a motorcycle accident shortly before petitioners' 1995 return was due. Furthermore, at about the same time, Mrs. Turner was diagnosed with and treated for a life-threatening illness. We appreciate the severity of petitioners' health problems during the relevant time and recognize that a serious illness can constitute reasonable cause for the failure to file a timely return. See, e.g., Fambrough v. Commissioner, T.C. Memo. 1990-104. Nevertheless, in this case, we note that petitioners' health problems did not prevent them from performing or maintaining other activities. For example, during the period between the due date and filing date, petitioner returned to work, Mrs. Turner apparently remained employed, and the wedding of petitioners' daughter was planned and took place. Petitioners obviously had competing demands on their time around the due date of their 1995 return, and they were entitled to prioritize those demands in a manner that best suited their interests. However, as we noted in Wilkinson v. Commissioner, T.C. Memo. 1997-410, "a taxpayer's selective

inability to meet his or her tax obligations when he or she can carry on normal activities does not excuse a late filing." Respondent's imposition of the addition to tax under section 6651(a)(1) for 1995 is sustained.

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.



# MUSTANG LIFESTYLES

# Terminal Velocity

O bviously uncomfortable with the tiny casino's neon and slot-machine demeanor, Charlie Turner and sidekick Mike Smiley are out the door about seven minutes after a pre–BluBlocker Nevada 100 cocktail reception begins. Minutes later, Turner and Smiley are sipping diet cola, swatting mosquitoes, and watching as Turner's '93 Steeda Cobra poses for photos beside a deserted highway.

"If we can find a little breeze, they can't stick to us," Turner says as he swats at a bloodsucker...

Ordered in November of 1992, Charlie Turner knew exactly what he wanted. Like the Shelby R-models of 1965, the idea that stuck in the back of his mind was to have a new SVT Mustang Cobra delivered race-ready from his local dealer, Woody Anderson Ford. But since such a car could not be built by the factory (until Ford built the Cobra Rs later in '93), Charlie had the dealer handle the special order of race options prior to his delivery. With help from Eddie Buck of Woody Anderson Ford, performance-oriented Steeda options were included in the original purchase agreement. Because of that order, the Cobra was sent directly from the Dearborn Assembly Plant to Steeda Autosports in Pompano Beach, Florida. With the help of Steeda's Steve Chapman, the Cobra became Steeda Cobra number one, not-

**Charlie Turner's 160mph Steeda Cobra is for new adventures on the road of life.**

article by Ed Lawrence
photographs by Ed Lawrence
and Sandy Turner

ed by the Steeda serialization "SC001."

Beyond the hoopla of any serialized performance Mustang exists the hardware. In addition to the 300hp Steeda engine upgrade, using a smart selection of Ford Motorsport components, Steeda added a 5psi Vortech supercharger, an external oil cooler and the tasteful addition of Cobra emblazoned valve covers. Underpinnings abound as the Steeda Suspension Package includes Sport Springs, a strut tower Brace, a G-trac brace, and a urethane bushing kit. Other suspension modifications include a Steeda adjustable rear swaybar, Tokico Illumina five-way adjustable shocks and struts, and a 17x8.5-inch wheel and tire combination using Steeda's Hexcentric wheels.

...Turner and Smiley roll away from the roadside photo shoot toward Ely, a whistle stop 250 miles north of Las Vegas. While choking down supper at a formica-and-plastic-plate diner, the evening's stillness is disturbed as the streets come alive with the sounds of 140 cars. Drivers descend from the cocktail party in droves for Rodger Ward's high-speed road race: an event that has been cleverly disguised as a timed speed event across 90 miles of Nevada State Highway 318. Turner's presence, however, is more than that of the standard thrill seeker who participates in such antics. Turner's reason for being here reflects a lifestyle change that began for him and his family in late 1992...

Charlie says, "An unhappy string of events lead my wife Sandy and I to the conclusion that we needed to get more out of life before it was too late." The lanky Turner, in uncharacteristic fashion, allows a personal side to show when he tells the story of his son's two closest friends who were killed in an auto accident. "Josh was supposed to be with them," Charlie says solemnly.

As Charlie continues, he tells that six months later, on the day after Christmas, "we lost everything we owned when our house burned to the ground." But something helped the family regroup — the enlightenment to live life to the fullest. For the elder Turner, automobiles became a remedy to life's problems. An automotive buying spree found the Turners the willing owners of six performance cars, a pair of Firebirds for father and son, two Mustangs (purchased the same day as the Firebirds), and later, a couple of Mitchell Daytona Camaros.

*...Charlie's goal is to connect the pair of small dots on the map labeled Lund and Hiko, averaging 140 miles per hour. "I was going to enter at 125mph," but after evaluating the road he describes as "basically straight with a few big sweepers, I decided to speed it up a bit." Due in part to the Vortech supercharger's torque*

*capabilities, Charlie feels it will be pretty easy to maintain that 140mph average...*

Eleven months after the fire, in another uncharacteristic surge of spontaneity, the methodical 47–year-old aeronautical engineer ordered his hot Mustang. "At that time," Charlie says, "I realized I didn't know anything about performance driving." That's a startling revelation from a guy whose approach to pitching in a softball league was to construct a practice field in his backyard in order to develop eight different pitches. "The engineer's approach, you know," he jokes.

*...While most drivers have a navigator/timer riding shotgun, Charlie has methodically plotted six road markers and will rely on three stopwatches and a crib sheet taped to the steering wheel to get him to the finish line in exactly 39 minutes. Despite the amateur status of the competition, winning speeds are typically within one mile per hour of targets — any greater deviation could mean that Turner won't be taking a trophy home to the farm in Ardmore, Alabama...*

During the six–month waiting period before the Steeda Cobra was delivered, Charlie filled his spare hours with track time at a

Skip Barber driving school. "I had to repeat the basic course — the instructors were speaking a foreign language and I didn't get the message." Charlie's eyes widen as he describes a Zen–like experience the second time he went through driving school. "During a warm-up lap it was as if someone had opened a door for me — all the information now made sense."

*...In order to make the 39 minute passage, a second long day is spent awaiting technical inspection of the vehicles. While the cars are displayed on Ely's streets, locals kick tires, mingle with drivers, and vote on the "Prettiest" and "Most Unusual" cars entered in the event. As the two sole tech inspectors evaluate each of the 140 cars, Turner grows impatient with the delays. That is due in part to the discovery of a potential problem. Thankfully, he was up before the roosters, making it easy to be first in line for tech-in which began at 8 am, By 10 am the Steeda Cobra has been inspected and Turner heads for the local Ford dealer to investigate a potential alternator problem.*

*No luck. It's Saturday, and no one's interested in finding solutions. Turns out the official pace car for the race, which is to be donated at 3 pm, has everyone's attention in the dealership. Turns out that an unidentified driver went*



# MUSTANG LIFESTYLES

## Terminal Velocity



airborne with the car into the sagebrush at something over 100 mph...

Turner's calculated and methodical approach to both the purchase and the race preparation of the Steeda Cobra are mirror images of the methods he employed in the late '70s when evaluating the aeroelastic systems on fighter plane wings. Turner explains, "We were just trying to design wings that would stay attached to the planes at high speeds under all types of flying conditions." His success with the tough assignment took him to another airplane builder whose planes were coming unglued in mid–flight. He was charged with the responsibility for finding the cause.

*...The solution, Turner hopes, is a new battery which apparently solves the "alternator problem." Back on the tarmac, the Cobra poses for more photos. Finally, at 6:30 pm, a driver's meeting breaks the monotony. Race director John Green explains race day procedures, reiterates that open–road racing is the most dangerous form of driving known to mankind, and tells everyone to have fun. The final, nine-hour countdown begins...*

It's not as though time is running out for Turner, it's just that Charlie no longer focuses all of his energy on keeping things in one piece — his professional career has taken a 180–degree turn. Now in his career he's interested in blowing things up — things like Scud missiles. "The project we're working on is a ground-to-air missile better than those used in Desert Storm. So far we have a 100 percent success ratio against incoming missiles," Charlie says offhandedly.

*...Early Sunday morning, a truck stop is designated as the staging area. At 6 am groups of racers are clustered into their respective speed brackets and the fastest group convoys first to the starting area. A desolate spot on the high desert, it is surrounded by pine trees and traces of snow on the highest elevations. Cars will start at one minute intervals with the fastest cars first. Turner will be about the 25th car off the line, but first, course workers make a safety sweep of Highway 318. The only thing to do while waiting is evaluate the variety of drivers and the variety of cars that wait in the starting area...*

Charlie Turner is a study in diversity. In contrast to his seat–of–the–pants decision to go racing, he followed his engineer senses to ensure that his Cobra was delivered to him his way. He politely refused the dealer's offer to prep the car after its four-point landing in Ardmore. The car, too, is a study in diversity. Charlie races in comfort — surrounded by grey leather seats with the option of cueing up his favorite compact disc on the stereo system. Of course, the fire extinguisher mounted on the kick panel and a full–race rollbar counter the luxury.

*...Hurry up and wait. A race veteran comments, "These things never start on time." Piercing the silence, two fighter jocks from the nearby air base break the monotony with a high-speed fly-by in F-16s.*

*Turner wakes from a nap on the pre–grid before the race and finds himself staring into the four–inch eyeball of an ESPN video camera held by a chuckling videographer. Charlie attempts an explanation, "I didn't sleep very well last night. I woke up at 3 am and did some course calculations. At 5 am, it was time to haul the car to the staging area...*

The trip to Nevada is the second time in twelve months Turner has indulged in the







newly discovered passion of transporting a car from his 57–acre farm in northern Alabama to a starting line on the other side of the country. The first time, father and son loaded Josh's '65 hardtop onto a trailer and participated in Mustangs Across America ("The Ultimate Drive," MM 7/94) driving from Sacramento, California, to Charlotte, North Carolina. That leisurely seven-day pace is a stark contrast of the BluBlocker 100 — it will end less than 40 minutes after it begins.

*...While the odds of bending the bodywork on Highway 318 are significantly lower than in the tight quarters of a closed road course like those he took driving school on, Charlie notes that the challenge still exists. One must maintain concentration while negotiating long straights that are sometimes punctuated by bumps that cause the cars to grab air. Most first-timers devote nail biting time to the prospect of driving through "The Narrows," four tight turns on a two mile stretch of road winding through a granite canyon just past the 70-mile mark.*

"The 'Narrows' corners aren't as bad as a tight turn on a road course, but I'll slow to around 100mph to get through in one piece," Charlie says. "I may lose some time, but I will still have 18 miles to make it up before the finish line..."

Turner will continue to negotiate the curves that life throws his way in the same manner he balances his career with favorite pastimes. He considers returning to Nevada in September, but he does have other irons in the fire.

*...Charlie finally gets the green flag at 10:30 am and immediately goes for it, finding top speed which exceeds 160mph. At the finish, Charlie takes the checkered flag with his foot glued to the floorboard. A slight frown acknowledges that he's 36 seconds behind his target time, averaging 137.63 mph.*

"It never entered my mind that I'd run out of gas. I mean, 16 gallons to go 90 miles? Easy!" Charlie's pre-race strategy didn't factor in headwinds which doubled fuel consumption. "I was right on the money at the first three checkpoints, but then I noticed the fuel gauge was going south. I was forced to slow down to conserve fuel," he says.

Charlie continues, "I put my foot back in it for the last few miles because I figured it wouldn't be that far to walk. I was hitting 160mph down the long stretches and the car handled like it was on rails." During a post race inspection, about a cup of fuel is found in the tank.

"Now I'm ready to race on a circle track," Charlie says after accepting his third place trophy at the awards banquet that capped off the Nevada weekend. He may be back for the event later in the year, but next weekend Charlie will take motorcycle safety lessons with son Josh. In order to maintain balance and variety, the pitcher's mound may be ignored while there are missiles to destroy. The '68 390 GT may continue to await a complete restoration while he and Josh tour the Alabama countryside on their new two-wheeled forms of transportation. The reality for Charlie Turner is that there are still many new things to do, and life's adventures to enjoy.

*"Mustang Lifestyles" represents a new feature format in Mustang Monthly which illustrates how Mustang owners enjoy their Mustangs. Whether it be racing, car shows, or weekend trips, this approach has been designed to display the flavor and variety of ponycar enthusiasts. Should you have a "Mustang Lifestyles" story to tell, write to us at Mustang Monthly, Mustang Lifestyles, P.O. Box 7157, Lakeland, Florida 33807-7157.*