T.C. Summary Opinion 2003-88


UNITED STATES TAX COURT


JOE GUADAGNO AND SUSAN BETH RISHEL GUADAGNO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 10312-01S.               Filed July 9, 2003.


Joe Guadagno and Susan Beth Rishel Guadagno, pro sese.

<u>T. Keith Fogg</u>, for respondent.


CARLUZZO, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed.  Unless otherwise indicated, subsequent section references are to the Internal Revenue Code in effect for the years in issue.  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.

Respondent determined deficiencies in petitioners' Federal income taxes of $3,976, $3,790, and $5,420 for 1996, 1997, and 1998, respectively. The issue for decision for each year is whether petitioners are entitled to deductions for expenses incurred in connection with the sale and distribution of Amway Corp. (Amway) products. The resolution of this issue for each year depends upon whether petitioners' Amway distributorship was a trade or business within the meaning of section 162.

Background

Some of the facts have been stipulated and are so found. Petitioners are husband and wife. They filed a timely joint Federal income tax return for each year in issue. At the time the petition was filed, petitioners resided in Fredericksburg, Virginia.

At all relevant times Joe Guadagno was an officer in the U.S. Marine Corps. Through June 1996, and then again from December 1996 through February 1997, Susan Guadagno was employed full time as a systems analyst by Systems Maintenance & Technology, Inc.

Toward the end of 1995, while living in North Carolina, petitioners were contacted by a distributor of Amway products; soon thereafter they became users and distributors of Amway products. Petitioners moved to Virginia in 1998. They continued to use and distribute Amway products throughout the years in

issue.  In September 1999, petitioners ceased their Amway activity and became involved in Quixtar, Inc., an Amway affiliate.

Amway is widely known as a marketer and supplier of various personal and household products.  Amway relies on distributors to purchase such products for personal consumption and for resale primarily to "downline"[1] distributors and customers.[2]  In general, a distributor's gross income is based on profit from retail sales, plus a "performance bonus" that is controlled by Amway and is influenced by the type and quantity of products the distributor purchases from Amway.

Profit from retail sales is determined by the difference between the wholesale price, which is set by Amway, and the retail price, which is set by the distributor.  On average, Amway's suggested retail price for its products is approximately 25-30 percent above wholesale, but distributors are entitled to sell a product at whatever price they choose, even if a sale at that price produces a loss.

---

[1] The term "downline" simply refers to one's relative position in a particular distribution chain of Amway products. One becomes an "upline" distributor after successfully recruiting one or more downline distributors.

[2] A customer purchases Amway products for personal consumption, but a distributor purchases Amway products intending to resell them to customers or other distributors.

Amway has about 360,000 independent distributors.  During the years in issue, an Amway distributor's average monthly gross income from Amway-related activities was less than $90.  Amway does not assign its distributors exclusive territories.  As best we can determine from the record, there is no contractual relationship between an upline distributor and his or her downline distributors.  A downline distributor is not obligated to remain in the distribution network of an upline distributor and is not obligated to achieve any minimum sales levels.

A distributor's performance bonus is determined by his or her "point value" and "business volume".  Point value is a number that corresponds to a particular tier in the Amway "performance bonus schedule".  Business volume is a dollar amount generally equal to 87 percent of the suggested retail price of a particular product.  Amway assigns a given point value and business volume to each product it sells but may change these figures at any time for any reason it chooses.[3]  Consequently, it is difficult to predict a performance bonus on the basis of the present point value and business volume of Amway products.  The performance bonus is calculated by multiplying a distributor's monthly business volume by a percentage that is listed in the performance

---

[3] According to petitioners' exhibits, the ratio of business volume to point value ranges from 2.00 to 2.62.

bonus schedule and corresponds to the distributor's monthly point value.[4]  This percentage ranges from 3 to 25 percent and increases in steps as a function of point value.

Petitioners' Amway activities may be summarized as follows. Petitioners were recruited by an upline distributor of Amway products in 1995.  They had no prior experience with Amway and no prior experience running a business.  Before becoming Amway distributors, petitioners received advice from other Amway distributors but did not solicit business advice from those outside the Amway community; nor did petitioners seek independent business advice during the course of their affiliation with Amway.

During the years in issue, petitioners spent little time or effort attempting to sell Amway products; instead they intended to develop a network of distributors.  Consequently, their potential for profit depended almost entirely on Amway's performance bonus program and the sales efforts of their downline distributors.  Recruiting productive downline distributors, therefore, was the key to petitioners' profit potential.  In this

---

[4] For example, assume that, in a given month, a distributor accumulates a point value of 1,000 and a business volume of $2,500.  According to Amway's performance bonus schedule, at a point value of 1,000, the performance bonus equals 12 percent of business volume.  Thus, in this example, the gross performance bonus is $300 (i.e., $2,500 x 0.12).  To determine the distributor's net performance bonus, this amount must be reduced by the dollar amount of bonuses owed to downline distributors.

regard, petitioners compiled an extensive list of family members, friends, and acquaintances that they used to identify and recruit potential downline Amway distributors.  Typically, petitioners made contact with these individuals either by telephone or by traveling to wherever these individuals lived to meet with them.  Nothing in the record suggests that petitioners made any effort to develop a profile of a successful downline distributor on which basis they would recruit; instead, petitioners recruited family, friends, and acquaintances.

Petitioners' attempts to recruit downline distributors also consisted of describing the Amway business plan to friends and acquaintances at gatherings in petitioners' home or at restaurants where food and beverages were routinely consumed.  Petitioners recruited 26 downline distributors in 1996, 37 in 1997, and 12 in 1998.  The record does not disclose how many, if any, of these downline distributors were in a familial or preexisting social relationship with petitioners.

The relationship between petitioners and their downline distributors was, at best, informal.  There were no contracts or minimum sales agreements.  Downline distributors were free to leave petitioners' distribution network at will, and, if they desired, could even join another Amway distributorship under a different upline distributor.  Petitioners were not assigned a sales territory, and, like their downline distributors, they

presumably had to compete with some of the roughly 360,000 Amway distributors for sales and recruits. Petitioners' lack of control over their downline distributors hampered their ability to predict sales and, in turn, performance bonuses. Their difficulty in predicting performance bonuses was compounded by Amway's practice of varying the point value it assigned to a given product. Petitioners' lack of control over these key components of their distributorship caused any predictions of performance bonuses that they might have made to be, at best, uncertain.

Included with petitioners' timely filed return for each year is a Schedule C, Profit or Loss From Business. Each return was prepared by a certified public account who also was an Amway distributor. Petitioners' Schedules C for 1996 and 1997 list their principal business as "Amway". For 1998, petitioners' Schedule C lists their principal business as "DistConsumerProduct". Petitioners reported net losses of $26,264, $24,047, and $19,810 on their Schedules C for 1996, 1997, and 1998, respectively.[5]

---

[5] From petitioners' trial presentation, it appears to us that, technically, petitioners conducted their Amway distributorship as a partnership, the income and expenses of which are not properly reportable on a Schedule C, Profit or Loss From a Sole Proprietorship, under any circumstance. See secs. 701 through 777. Nevertheless, because the parties ignored this technicality, we do likewise.

In the notice of deficiency, respondent disallowed the losses claimed on the Schedules C. Other adjustments made in the notice of deficiency either give effect to these disallowances or are not in dispute.

## Discussion

According to petitioners, their Amway activity, at all relevant times, was a trade or business. Therefore, petitioners argue that the expenses they incurred in carrying on this activity should be allowed as deductions. See sec. 162(a) (generally allowing deductions for the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business). Respondent argues that petitioners were not carrying on a trade or business because they lacked the requisite profit objective, and petitioners are not, therefore, entitled to the deductions they claim, except to the extent allowed by section 183.[6] For the following reasons, we

---

[6] In relevant part, sec. 183 provides:

    SEC. 183(a). General Rule.–In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

    (b) Deductions Allowable.–In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed--

                (continued...)

agree with respondent.

The term "trade or business" is not precisely defined in section 162 or the regulations promulgated thereunder; however, it is well established that in order for an activity to be considered a taxpayer's trade or business for purposes relevant here, the activity must be conducted "with continuity and regularity" and "the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).

The test for whether a taxpayer conducted an activity for profit is whether he or she entered into, or continued, the activity with an actual or honest objective of making a profit. See Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. The taxpayer's profit objective for each

---

[6](...continued)

     (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

     (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

year in which the activity is conducted must be bona fide, taking into account all of the facts and circumstances. See Keanini v. Commissioner, supra; Dreicer v. Commissioner, supra at 645; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); sec. 1.183-2(a) and (b), Income Tax Regs. More weight is given to objective facts than to the taxpayer's statement of intent. See Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a), Income Tax Regs.

The following nonexclusive factors are considered in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. See sec. 1.183-2(b), Income Tax Regs. No one factor is determinative, and our conclusion with respect to petitioners' profit objective does not

result merely from comparing the number of factors that suggest a profit motive against the number of factors that suggest the opposite. See sec. 1.183-2(b), Income Tax Regs.

After careful consideration, we are satisfied that petitioners did not engage in the sale and distribution of Amway products with the profit objective necessary for that activity to be considered a trade or business within the meaning of section 162 during any of the years in issue.[7] Our conclusion in this regard is particularly influenced by the following.

Before becoming Amway distributors, petitioners had neither experience with Amway nor experience in running a business. Nevertheless, they did not seek independent business advice at the outset, and they did not seek independent business advice afterwards even though losses were sustained year after year. Instead, they relied upon other Amway distributors whose advice is more accurately characterized as personal motivational advice than strategic business advice. Under the circumstances, petitioners' failure to seek independent business advice strongly suggests that they were distributing and using Amway products for purposes other than profit. See Ogden v. Commissioner, T.C. Memo. 1999-397, affd. 244 F.3d 970 (5th Cir. 2001).

---

[7] Although neither party specifically addressed the point, our analysis presumes that respondent bears the burden of proof. See sec. 7491(a).

Petitioners' Amway activity has resulted in substantial losses. Losses that are incurred in the initial stages of an activity do not necessarily suggest the absence of an honest profit objective. However, losses that continue without explanation beyond that period typically required for an activity to become profitable may indicate the lack of a profit objective. See Golanty v. Commissioner, supra at 427; Conner-Nissley v. Commissioner, T.C. Memo. 2000-178; Ogden v. Commissioner, supra. Despite year after year of losses, petitioners did not change tactics to increase the likelihood of earning a profit.

For the most part, the losses that petitioners incurred year after year are attributable to automobile and travel expenses (including the expenses incurred in attending various seminars). Petitioners did not concentrate on selling Amway products to customers, thereby eliminating sales as a potential source of profit. A substantial portion of the income earned from bonuses they received each year was paid out to their downline distributors. Other components of income were completely offset by matching expenses for the same items. Against the slim margin for profit, petitioners haphazardly incurred significant expenditures for automobile and other travel expenses in order to recruit downline distributors primarily from the ranks of family, friends, and acquaintances, some of whom lived considerable

distances from petitioners.  Such behavior suggests the absence of a profit objective.  See Bessenyey v. Commissioner, supra.

Although petitioners maintained detailed records for certain aspects of their distributorship, the records apparently were kept more for substantiation purposes than for use as analytical business tools.  See Theisen v. Commissioner, T.C. Memo. 1997-539; Hart v. Commissioner, T.C. Memo. 1995-55; Poast v. Commissioner, T.C. Memo. 1994-399.

In closing, we note that even if petitioners had maintained their monthly point value goal of 4,000, their expenses would still have exceeded their income from performance bonuses and retail sales.

We are satisfied that petitioners' primary purpose for engaging in the sale and distribution of Amway products was not for income or profit.  After consideration of all of the facts and circumstances, we find that petitioners' Amway distributorship does not fit within "a common-sense concept of what is a trade or business."  Commissioner v. Groetzinger, 480 U.S. at 35.  Therefore, petitioners are not entitled to the deductions here in dispute, and respondent's determination in this regard is sustained.

Reviewed and adopted as the report of the Small Tax Division.

To reflect the foregoing,

<u>Decision will be</u>

<u>entered for respondent</u>.